Robert L. MACHADO, Appellant,

v.

STATE of Alaska, Appellee.

No. A–2735.

Court of Appeals of Alaska.

Aug. 24, 1990.

Glenn E. Cravez, Cravez & Weber, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON,* JJ.

## OPINION

COATS, Judge.

Robert L. Machado was convicted following a jury trial of attempted murder, arson in the first degree, criminal possession of explosives, and assault in the first degree. These convictions arose from an incident in which Machado and others attempted to kill Andrew Twogood with a car bomb. The jury also convicted Machado of two counts of perjury for false testimony which he gave as a witness at a hearing where the state used his testimony to obtain a search warrant. Superior Court Judge Karl S. Johnstone sentenced Machado to a composite sentence totalling forty-eight years of imprisonment. We affirm the conviction but remand for resentencing.

Richard Erickson, Machado's co-defendant, and Robert Marzak operated a wrecking yard in Fairbanks, leasing it from Twogood, who also owned and operated the ABC Wrecking Yard in Anchorage. Twogood suspected that Erickson and Marzak were using the Fairbanks yard as a front for dealing in stolen automobiles and parts; Twogood eventually reported his suspicions to police and testified before a grand jury. According to the state, Erickson and Marzak then arranged for Machado and another man, Darren Taylor, to kill Twogood. Machado and Taylor drove to Anchorage, and Taylor placed a bomb in Twogood's car while Machado acted as a lookout on May 19, 1986; the bomb seriously injured Twogood and Fred Neubauer, one of Twogood's employees.

The state's investigation of the case proceeded slowly. Eventually, in March 1987, Sergeant Frank Coletta questioned Machado about his knowledge of the car bombing. Machado denied having been in Anchorage at the time of the bombing until Coletta showed him hotel receipts. Machado then admitted having driven to Anchorage with Taylor and conceded that they might have stopped at Twogood's place of business. However, he denied any knowledge of the bombing until his return to Fairbanks. He implied that he could give the police additional information if he were given immunity.

On April 13, 1987, Machado signed an immunity agreement in which the state

* This case was submitted for decision prior to Judge Singleton's resignation.

agreed to forego any prosecution of Machado in connection with the events of May 19, 1986. The agreement was premised on Machado's representation "that he was neither directly or indirectly involved in the knowing construction, physical placement, ignition or detonation of the incendiary or explosive device" used in the car bombing. Among other things, Machado was required "to speak truthfully, completely, and in good faith without reservation whatsoever during any testimony he offers...." Any false testimony would be considered a material breach and void the agreement and could be used against him. The agreement additionally required Machado to work with Coletta and to participate in wired conversations.

The agreement included the following incorporation clause: "This document represents the entire agreement between Robert Machado and the State of Alaska. Machado, by signing this document, acknowledges that no oral agreements exist outside this written document." The page of the agreement signed by Machado stated that he "had a sufficient period of time to discuss this agreement and its legal and practical consequences with my attorney Ray Funk.... I understand the agreement and have no questions regarding it. At this time I am entering into this agreement voluntarily, knowingly, and intelligently, and with a full understanding of all its consequences and of my legal rights which have been explained to me in detail by my attorney, Mr. Funk."

After signing the immunity agreement on the record, Machado testified at a search warrant hearing to obtain *Glass*[1] warrants for electronically monitored conversations. However, Machado's testimony was apparently not completely truthful. The state alleged that the following statements were untrue in a later perjury indictment:

(1) Machado testified that he did not see any plastic explosives until the day of the bombing; in fact, Machado saw the explosives the second day he and Taylor arrived in Anchorage, may have seen them in Fairbanks, and may have provided Taylor with detonators one week before their departure from Fairbanks;

(2) Machado testified that he did not see how the bomb was built; in fact, Machado observed Taylor construct the bomb;

(3) Machado testified that he exited the truck, walked into the ABC office, and, when he returned to the truck, the bomb was gone; in fact, Machado had remained in the truck, served as Taylor's lookout, and watched Taylor place the bomb in Twogood's car;

(4) Machado testified that he did not recall seeing Twogood's car the day of the explosion; in fact, he watched Taylor place the bomb in it.

Two days after the search warrant hearing, Machado indicated to Coletta that some of his testimony had been incomplete and not entirely truthful. However, he continued to participate in the investigation and engaged in a series of wired conversations with Taylor, Marzak, and others. When confronted with the contents of these conversations, Taylor and Marzak pleaded guilty and made extensive confessions. These confessions revealed additional perjury committed by Machado in the search warrant hearing. It was only then, according to the state, that the full extent of Machado's participation in the bombing became evident and the state concluded that Machado was "directly or indirectly involved in the knowing construction, physical placement, ignition or detonation" of the bomb, accordingly prompting it to revoke the immunity agreement.

The state then prosecuted Machado. Machado claimed that the prosecution was improper since it was in violation of the immunity agreement. Judge Johnstone denied Machado's motion to dismiss, finding that Machado had breached the immunity agreement. The prosecution proceeded, and Machado was convicted. He now appeals that conviction to this court.

---

1. *State v. Glass,* 583 P.2d 872 (Alaska 1978).

## IMMUNITY AGREEMENT

Machado first raises several issues concerning the immunity agreement which he had with the state. Machado argues that Judge Johnstone erred in failing to dismiss the charges against him based upon the immunity agreement.

Investigator Coletta first talked with Machado on March 23, 1987. Between March 25 and March 31, Coletta and Machado began discussing the possibility of an immunity agreement. Coletta told Machado that immunity might be possible if Machado was truthful, was not directly involved in the bombing, and would be willing to engage in monitored conversations. At one point in their discussions, Coletta told Machado that an immunity agreement would be impossible if Machado turned out to be the "main man" in the bombing.

Coletta also told Machado that he had no authority to grant immunity or to make any promises and that any deal would have to come from the district attorney's office. Machado told Coletta that he wanted an agreement in writing. Coletta testified that, prior to the agreement, Machado indicated "that he might have some information that might be of value to the police" but was vague about specifics; the first indication of what the details might be came from Machado's attorney in the form of an outline of his expected testimony prior to the search warrant hearing.

Fairbanks Assistant Public Defender Raymond Funk was asked to represent Machado and advise him about the immunity agreement. Funk met with Machado on April 11. While Funk did not know if Machado had any prior understanding of what an immunity agreement might contain, he was under the impression that Machado and Coletta had been unable to work out an agreement themselves. Machado told Funk that he wanted to secure an agreement in writing. According to Funk, Machado "wasn't sure on how much he could bargain for. And he was still ... wanting to know how much he could get for doing what they wanted him to do." Apparently Machado discussed with Funk the possibility of obtaining a sentence re-duction for an unrelated offense; Machado also indicated to Funk his hopes of receiving money or a ticket to California in exchange for his cooperation and testimony. However, Machado and Funk apparently agreed that, given the seriousness of the offense for which Machado could be potentially charged—attempted murder—full immunity for crimes related to the car bombing was the best deal they could expect.

Machado, Funk, Assistant District Attorney Stephen Branchflower, Coletta, and several other law enforcement officials, met on the morning of April 13. At that time, Machado and Funk first saw the proposed agreement which had been drafted by Blanchflower. Funk insisted that the phrase which initially had provided that the agreement was premised on Machado's representation that he had not been involved in the "construction, *transportation*, placement, ignition, or detonation" of the bomb be altered to read "construction, *physical* placement, ignition, or detonation" (emphasis added). "Physical placement" was defined as "personally and physically placing the device in the automobile." Funk realized that the term "transportation" had to be omitted because Machado had driven the truck part-way to Anchorage and to Twogood's wrecking yard. At this point, all discussions were between Branchflower and Funk; Machado did not negotiate directly with Branchflower.

Funk testified that his understanding of Machado's involvement in the car bombing was that

[Machado] had gone down to Anchorage with Darren Taylor, that at some point Darren Taylor had a paper bag, that they stopped at a Seven–Eleven type place and got ... foil and batteries, that Mr. Machado recognized among the items there were C–4 explosives and realized that Mr. Taylor was putting together a bomb.... [Machado] went in to ask for some car parts, and the bag with what was a bomb was there when he left and not there when he got back. And he later knew that the bomb had gone off and the resulting injuries.

This included an understanding that Machado did not know about the bomb until after he and Taylor had actually arrived in Anchorage. The underlying premise of the agreement, according to Funk, was that Machado "wasn't the person that made or set the bomb." Funk also testified that he had no reason to suspect that Machado perjured himself in the search warrant hearing which followed. Machado's testimony at the search warrant hearing was the testimony upon which the state based the perjury charges against Machado.

Funk understood that the state could revoke the agreement for any one of three reasons: if Machado's involvement in the bombing was substantially greater than he had represented, if Machado did not tell the complete truth, or if Machado did not cooperate by engaging in wired conversations under the supervision of Investigator Coletta. He explained this to Machado and went over the agreement "line by line" with Machado. The agreement itself included a representation that Machado had discussed its terms and consequences with Funk and that he understood them. Additionally, at the search warrant hearing on the afternoon of April 13, Branchflower again discussed in detail, with Funk present, the terms of the agreement; under oath, Machado voluntarily consented to the agreement, provision by provision, and signed it on the record.

Judge Johnstone listened to testimony by Funk and Coletta and reviewed evidence submitted by Machado, including tapes and transcripts of conversations between Machado and Coletta concerning the possible immunity agreement. However, he concluded that the terms of the document signed by Machado accurately reflected the agreement bargained for and reached by Machado and the state, finding that there were "no ambiguities in the contract that have been changed or altered in any way by the extrinsic evidence offered." He specifically rejected the notion that anything said differently in prior interviews between Machado and Coletta could be used to alter or explain away any of the terms of the document. Judge Johnstone gave particular weight to Funk's testimony as "proba-

bly best set[ting] forth what the parties bargained for." He found that the bargain required, as the written agreement stated, "that Mr. Machado was neither directly or indirectly involved in knowing construction, physical placement, ignition, or detonation of [the] incendiary or explosive device." The judge then found that Machado had materially breached his obligations under the agreement.

Machado first contends that Judge Johnstone erroneously failed to consider extrinsic evidence in deciding whether Machado breached the immunity agreement.

■ An immunity agreement is contractual in nature, though principles of fundamental fairness require that contract law not necessarily be mechanically applied. *Closson v. State*, 784 P.2d 661, 664–65 (Alaska App.1989). As this court stated with regard to extrinsic evidence:

When doubt arises concerning the terms and scope of an immunity agreement, the trial court must consider the totality of the evidence, including the agreement itself and the circumstances under which it was made:

In determining whether a governmental promise has been made and in ascertaining the scope of any such promise, it is appropriate for a trial court to consider not only the form and content of any written document purporting to incorporate the government's representations to the defendant but also any oral statements made to the defendant as well as extrinsic evidence relating to the circumstances of the government's dealings with the defendant. Consideration of extrinsic evidence is especially appropriate when the written document itself is ambiguous. Under such circumstances, a court's task is not to rewrite the agreement but to construe it in a manner consistent with the intent of the parties and the defendant's right to be treated fairly by the government.

*Id.* at 665 (quoting *People v. Romero*, 745 P.2d 1003, 1010 (Colo.1987), *cert. denied*, 485 U.S. 990, 108 S.Ct. 1296, 99 L.Ed.2d 506

(1988)). The "trial court's findings on the terms and scope of an immunity agreement ... must be upheld unless clearly erroneous." *Id.*

In this case, although not having the benefit of the *Closson* decision, Judge Johnstone followed its requisites. He did so in light of Alaska's parole evidence rule which allows the trial court to consider extrinsic evidence along side the contract without a preliminary finding of ambiguity. *Alyeska Pipeline Service Co. v. O'Kelley,* 645 P.2d 767, 771 & n. 1 (Alaska 1982). However, after considering both the terms of the contract and the extrinsic evidence presented by Machado, he decided that there was no basis for concluding that the written agreement meant anything other than what it said. Significantly, Machado had been represented by counsel who carefully explained its terms to him. Additionally, while Machado focuses on earlier conversations with Coletta, Coletta emphasized to Machado that he did not have the authority to grant immunity and that the decision would be made by the district attorney's office; it appears clear from Machado's responses in those conversations that he understood this fact. Machado's argument that Judge Johnstone erroneously refused to consider extrinsic evidence therefore is without merit. To the contrary, the record indicates that the judge did consider the extrinsic evidence, simply rejecting the conclusion that it compelled modification of the terms of the immunity agreement. It also appears that Judge Johnstone's ultimate conclusions regarding the scope of the agreement were not clearly erroneous.

Machado next argues that Judge Johnstone erred in concluding that Machado materially breached the immunity agreement, thereby allowing the state to bring charges against him. Machado argues that he did not breach the agreement or, at least, that he "substantially performed" his obligations. He points out that he testified for the state, allowing the state to obtain a search warrant to electronically monitor other suspects; that he made numerous taped statements to the police concerning his involvement; and that he engaged in several conversations with Taylor and Marzak which the state monitored and used in its cases against those codefendants. He claims that these actions put him and his family in serious physical danger. Machado contends that the state investigation of the car bombing was failing until the state secured his participation. Finally, Machado contends that even if he did give some untruthful testimony at the search warrant hearing, "[i]t was only with respect to certain details of Machado's involvement in the car-bombing which did not affect, in any way, the outcome of the state's investigation."

Whether a breached provision of an immunity agreement is material is a question of law, subject to *de novo* review by this court. *Closson,* 784 P.2d at 665. However, relevant factual determinations must be upheld unless "clearly erroneous." *Id.* at 665–66. "Decisions on materiality must be based on the totality of the circumstances. The question is one of degree, centering on the reasonable expectations of the parties." *Id.* at 665 (citations omitted). In other words, a material breach is one that "will or may result in the other party not receiving substantially what [that party] bargained for." J. Murray, *Murray on Contracts* § 167, at 323 (1974); *see also Restatement (Second) of Contracts* §§ 241–42 (1981).

Judge Johnstone found that Machado materially breached the immunity agreement for two reasons. First, he found that the agreement required that Machado be truthful and

> candidly reveal the whole truth about the bombing incident, all the events leading up to that day, as well as any information he had in his possession or concerning the events which occurred since that time. And that he would do his best to comply with the terms of the agreement, deal with the State of Alaska, the police, the courts, any defense counsel, his defense counsel, honestly and in good faith without reservations whatsoever.

However, Judge Johnstone concluded that the state had proved by a preponderance of

the evidence that Machado committed perjury on several occasions, that he did not make candid and full disclosure in his interviews with Coletta, and that when "he did give information he did so not honestly but in fact shading the truth or outright not telling the truth."

The second reason Judge Johnstone found Machado to have materially breached the agreement concerned Machado's level of involvement in the bombing. The judge concluded that the state established that Machado "was directly involved in the knowing construction, physical placement, ignition, or detonation of the incendiary device as an accomplice." The judge believed that Machado "supplied—or participated in the supply of detonation devices, caps; acted as a lookout; staked out the [victim] at his home; staked out the [victim] at his place of business; participated in the construction of the device."

We conclude that Judge Johnstone's finding that Machado materially breached the immunity agreement is not clearly erroneous. The record supports the conclusion that Machado was not completely truthful and candid in his statements to the police and in his testimony at the search warrant hearing. Second, the record supports Judge Johnstone's finding that Machado's level of involvement in the car bombing was significant and active. The fact that Machado apparently performed his third major obligation under the agreement—to engage in monitored conversations with Marzak, Taylor, and others—does not negate his material breaches with regard to his other agreements under the contract. See Closson, 784 P.2d at 665–66 (fact that defendant engaged in a number of wired conversations which significantly advanced state's investigation did not preclude finding that defendant had breached immunity agreement). The state agreed not to prosecute someone who was not "directly or indirectly involved in the knowing construction, physical placement, ignition or detonation" of the car bomb. It did not agree to forego prosecution of an active accomplice.

██ Machado also argues that the state waived its right to cancel the immunity agreement because it continued to accept performance from Machado after the state had learned that Machado had breached the agreement. However, Judge Johnstone found that the state was not aware of the full extent of Machado's perjury at the search warrant hearing until after Taylor and Marzak confessed. He found that it was only at that time that the state was aware that Machado was involved in the "knowing construction, physical placement, ignition or detonation" of the bomb. Judge Johnstone's findings are supported by the record. Once the state learned that Machado was an active accomplice in the attempted murder of Andrew Twogood, the state was no longer bound by the immunity agreement. The state was then entitled to prosecute Machado on any and all charges. We therefore conclude that Judge Johnstone did not err in refusing to dismiss the charges against Machado based upon the immunity agreement.

## SPEEDY TRIAL

██ Machado next contends that Judge Johnstone erred in failing to dismiss his case under Criminal Rule 45, the speedy trial rule. Under Rule 45, a criminal defendant must be brought to trial within 120 days from arrest, arraignment, or the date the charge is served upon the defendant, whichever is first. Alaska R.Crim.P. 45(b), (c). The rule excludes several time periods, including "[t]he period of delay resulting from an adjournment or continuance granted at the timely request or with the consent of the defendant and his counsel." Alaska R.Crim.P. 45(d)(2). Machado's argument turns on his contention that he was not bound by his counsel's request for a 30–day continuance on September 15, 1987; Machado claims that he was not present in court when his attorney requested the continuance. However, Judge Johnstone found that Machado was present at the September 15 hearing, and that he was therefore bound by his counsel's request for a continuance. We have reviewed the record and conclude that Judge Johnstone's finding is not clearly erroneous. Judge

Johnstone therefore did not err in refusing to grant Machado's Rule 45 motion.

We also conclude that whether to bring a motion for a continuance is primarily the responsibility of counsel. Generally, the court may rely upon the request of counsel for a continuance, without seeking a separate waiver from the defendant. We recognize that Criminal Rule 45(d)(2) refers to a "continuance granted at the timely request or with the consent of the defendant *and* his counsel" (emphasis added). While we believe that this rule gives the defendant the right to object to a continuance and that the rule assumes that counsel will make the decision to move for a continuance after consultation with the defendant, we do not believe that the court should normally be required to obtain a separate waiver from the defendant. The Alaska Supreme Court appears to have accepted this view in *Snyder v. State*, 524 P.2d 661, 664 (Alaska 1974). *See also Henson v. State*, 576 P.2d 1352, 1356 n. 9 (Alaska 1978) (defendant's consent to Rule 45 waiver presumed absent "some expression of objection" on the record); *Andrew v. State*, 694 P.2d 168, 180 (Alaska App.1985) (Singleton, J., concurring), *aff'd as modified*, *State v. Andrew*, 718 P.2d 471 (Alaska 1986) (suggesting that request for Rule 45 continuance is primarily a "tactical" decision to be made by counsel).[1]

## SEVERANCE

■■■ Machado next argues that Judge Johnstone erred in denying Machado's motion to sever the perjury charges from the other charges against him. Machado first contends that the charges were not properly joined under Criminal Rule 8(a). However, the perjury charges and the substantive charges relating to the car bombing were "based on the same act or transaction" and therefore were properly joined initially. Alaska R.Crim.P. 8(a)(2).

Alternatively, Machado contends that Judge Johnstone erred in refusing to grant his motion for severance under Criminal Rule 14. Machado submitted an offer of proof indicating that, if he chose to testify, he would have testified about the perjury charges. However, in *Huff v. State*, 598 P.2d 928, 932–33 (Alaska 1979), the supreme court noted that "[s]everal federal courts have held that denial of severance is not an abuse of discretion in situations where a perjury charge is joined to an *underlying related offense*." The supreme court indicated that where a perjury charge is joined with a closely related substantive offense, the evidence pertaining to the perjury charge is admissible in the prosecution for the substantive offense and vice versa. In analyzing *Huff*, the court concluded that "[b]ecause the charges arise from a continuing transaction and the evidence is mutually admissible, defendant would be no less prejudiced in separate trials, and the state would incur greater expense." *Id.* at 933. The court concluded that Huff was not prejudiced and that Huff was not entitled to severance. *Id.* We similarly conclude that the evidence of Machado's perjury and the evidence of his substantive offenses would have been cross-admissible. Judge Johnstone therefore did not err in refusing to grant Machado's motion for severance.

## MOTION FOR ACQUITTAL

■■■ Machado next argues that Judge Johnstone erred in failing to grant a motion for judgment of acquittal at the close of the state's case on Counts I through IV which involved the substantive charges against Machado. He contends that the language of the indictment did not charge him as an accomplice in the car bombing and that the evidence presented by the state showed that Taylor, not Machado, was the principal.

This argument has no merit. First, although the language of the indictment ap-

---

1. Machado also argues that Judge Johnstone erred in failing to dismiss his case based on the separate constitutional guarantee of a speedy trial. The defendant is required to show prejudice to demonstrate a denial of the constitution-

al right to speedy trial. Machado has not argued that he was prejudiced. His contention therefore has no merit. *Brower v. State*, 683 P.2d 290, 293 (Alaska App.1984).

pears to charge Machado as a principal, Counts I–IV all cite the accomplice liability statute, AS 11.16.110(2)(B). Second, even if Machado had been charged as a principal, he would still be subject to conviction based upon evidence which only showed that he acted as an accomplice. Alaskan law does not distinguish the criminal liability of principals and accomplices. *Morris v. State*, 630 P.2d 13, 15–16 (Alaska 1981); *Scharver v. State*, 561 P.2d 300, 302 (Alaska 1977); *Ransom v. State*, 460 P.2d 170, 172–73 (Alaska 1969). "A person is legally accountable for the conduct of another constituting an offense if with intent to promote or facilitate the commission of the offense, the person aids or abets the other in planning or committing the offense." AS 11.16.110(2)(B). "The indictment, therefore, was sufficient to put [Machado] on notice that he could be found liable under evidence showing that he was a principal or under evidence showing that he only acted as an accomplice." *Morris*, 630 P.2d at 16.

### NEW TRIAL

■ Machado next argues that Superior Court Judge Peter A. Michalski erred in failing to grant his new trial motion based on Machado's claim that Judge Johnstone had a discussion regarding the case with one of the jurors. Judge Michalski heard the evidence regarding Machado's claim. He concluded, based upon the testimony of Judge Johnstone and the juror, that no improper contact or conversation occurred. *See* III *ABA Standards for Criminal Justice* § 15–3.7(b), at 15–111, and commentary at 15–112 (2d ed. 1982). This finding is supported by the record. We therefore conclude that Judge Michalski did not err in rejecting Machado's new trial motion.

### SENTENCE

Machado argues that his sentence for Count I (attempted murder), Count III (possession of explosives), and Count IV (arson)

violated double jeopardy because the charges relate to a single act, Machado's role in the car bombing. In a related point, Machado argues that the two separate convictions for counts V and VI (perjury) violated double jeopardy because the convictions relate to the same matters and occurred at the same proceeding.[2]

*Whitton v. State*, 479 P.2d 302 (Alaska 1970), is the leading case concerning whether a defendant's constitutional right against double jeopardy has been violated when he is sentenced for multiple offenses resulting from a single act. *Whitton* requires the trial judge to make an initial inquiry into whether there are differences in the defendant's intent or conduct for the various offenses which the state has charged. Second, the trial judge must examine the societal interests which the statutes seek to vindicate or protect.

> If such differences in intent or conduct are significant or substantial in relation to the social interests involved, multiple sentences may be imposed.... But if there are no such differences, or if they are insignificant or insubstantial, then only one sentence may be imposed under double jeopardy.

*Id.* at 312.

■ The statutes which proscribe attempted murder, possession of explosives, and arson differ markedly in the conduct which they prohibit and in the specific societal interests which they seek to preserve. Count I charged that Machado intentionally attempted to cause the death of Andrew Twogood. AS 11.41.100(a)(1); AS 11.31.100. Count III charged Machado with possessing explosives with the intent to commit a crime. AS 11.61.240. We conclude that the legislature intended to separately punish persons who possess explosives with the intent to commit a crime. Explosives present a particular danger because they give the perpetrator of a crime

---

**2.** The state contends that Machado must demonstrate plain error because he did not raise the double jeopardy issue in the trial court. However, the record shows that Machado raised these arguments at the sentencing hearing. In any event, a defendant is entitled to raise a double jeopardy claim for the first time on appeal. *Newsome v. State*, 782 P.2d 689, 691 (Alaska App.1989); *Clifton v. State*, 758 P.2d 1279, 1285 (Alaska App.1988); *Horton v. State*, 758 P.2d 628, 632 (Alaska App.1988).

the possibility of being far away at the time that they are detonated and because they can indiscriminately injure numerous victims. Machado was therefore subject to separate punishments on the attempted murder charge and on the possession of an explosive device charge.

We similarly conclude that Machado was subject to separate punishment on the conviction for arson. This count charged Machado with intentionally damaging Twogood's auto by causing an explosion and, by that act, with recklessly placing another person in danger of serious physical injury. AS 11.46.400(a). The arson statute is distinct in that it prohibits the intentional damage of property, and therefore protects different societal interests than the attempted murder and assault statutes. We conclude that Machado's conviction for arson did not violate double jeopardy.

■ Machado also argues that his two convictions for perjury violated double jeopardy. Count V charged that Machado knowingly made four false sworn statements at the search warrant hearing concerning his participation in the car bombing. Count VI charged that during the search warrant proceeding, Machado made false statements as follows: "1) That he was not involved directly or indirectly in the construction, placement or ignition of the explosive device; 2) That he did testify truthfully, completely, and in good faith without reservation."

We are aware of substantial authority allowing a defendant to be convicted on multiple counts of perjury where the perjury occurred at a single hearing and where the factual difference between the perjurious statements is slight. *See Commonwealth v. Gurney,* 13 Mass.App. 391, 433 N.E.2d 471, 475 (1982). *Cf. DeMan v. State,* 677 P.2d 903, 906 (Alaska App.1984) (no double jeopardy violation for similar perjury which occurred at different proceedings). However, we conclude that, applying the *Whitton* test to the two counts of perjury, only one conviction can stand. Count V charges that Machado made several specific false statements concerning his involvement in the car bombing. Count VI

is a general count, which appears to include the specific statements which Machado was charged with in Count V. We accordingly conclude that Counts V and VI merge.

Machado next contends that his composite sentence of forty-eight years is excessive. Judge Johnstone sentenced Machado to twenty years of imprisonment on Count I (attempted murder) and to two concurrent twenty-year terms on Counts III (possession of explosives) and IV (arson). These counts all involve the crimes which caused injury to Andrew Twogood. Judge Johnstone sentenced Machado to a consecutive term of twenty years on Count II (assault in the first degree). This charge related to the assault on Fred Neubauer. Counts I through IV are all class A felonies. Judge Johnstone also sentenced Machado to two concurrent eight-year terms for the two perjury counts. He imposed these terms consecutively to the other charges. Perjury is a class B felony offense. Because Judge Johnstone imposed the two perjury sentences concurrently to each other, our decision merging the two perjury counts does not change Machado's overall sentence which remains at forty-eight years of imprisonment.

Machado was a second felony offender for purposes of sentencing on the substantive counts and a third felony offender for purposes of sentencing on the perjury convictions. Accordingly, he was subject to a ten-year presumptive term for the class A felonies, AS 12.55.125(c)(3), and a six-year presumptive term for the class B felonies, AS 12.55.125(d)(2). The maximum term for a class A felony is twenty years, AS 12.55.-125(c), and the maximum term for a class B felony is ten years, AS 12.55.125(d).

Judge Johnstone found that five aggravators applied to Counts I–IV: (1) that "the defendant was on furlough under AS 33.30 or on parole or probation for another felony charge or conviction that would be considered a prior felony conviction under AS 12.55.145(a)(2)," AS 12.55.155(c)(20); (2) that "the defendant committed the offense pursuant to an agreement that the defendant would pay or be paid for the commission of the offense, and the pecuniary in-

centive was beyond that inherent in the offense itself," AS 12.55.155(c)(11); (3) that "the defendant's conduct during the commission of the offense manifested deliberate cruelty to another person," AS 12.55.-155(c)(2); (4) that "the defendant's conduct created a risk of imminent physical injury to three or more persons, other than accomplices," AS 12.55.155(c)(6); and (5) that "the conduct constituting the offense was among the most serious conduct included in the definition of the offense," AS 12.55.-155(c)(10).

With regard to the perjury counts, Judge Johnstone found two aggravators: AS 12.-55.155(c)(20) (offense committed while on furlough or parole) and AS 12.55.155(c)(10) (most serious conduct). He also concluded that Machado was a "worst offender," finding that Machado was "an extreme danger to the public" and that he had "shown a total lack of remorse."

Judge Johnstone found a single mitigator for Counts I–IV: that "the defendant assisted authorities to detect, apprehend, or prosecute other persons who committed an offense," AS 12.55.155(d)(12). However, he declined to give it any weight in imposing sentence, pointing out that while Machado technically assisted authorities, "at the same time he was attempting to focus [attention] ... on others and diverting attention from himself.... [H]e assisted authorities on one hand; on the other hand he hampered and hindered authorities." The judge also rejected two additional mitigators: that "the defendant, although an accomplice, played only a minor role in the commission of the offense," AS 12.55.-155(d)(2); and that "the conduct constituting the offense was among the least serious conduct included in the definition of the offense," AS 12.55.155(d)(9).

Because of the various aggravators, and because he found Machado to be a "worst offender," Judge Johnstone sentenced Machado to a sentence greater than the presumptive term. The ten year class A sentences were increased to the maximum twenty-year terms; the six-year presumptive for the class B perjury sentence was

increased by two years for an eight-year term (two years less than the maximum).

Machado challenges his sentences on the theory that Judge Johnstone was clearly mistaken in finding three aggravators: that his conduct placed three or more people in physical danger, that his conduct manifested deliberate cruelty, and, with respect to the perjury convictions, that his conduct was among the most serious included in the definition of the offense. Additionally, he argues that Judge Johnstone should have given him credit for the one mitigator he found: that Machado assisted authorities in their investigation of the car bombing.

 Machado's sentence can be reversed on the basis of excessiveness only if it is "clearly mistaken." *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974). The "clearly mistaken" standard also governs with regard to the sentencing judge's adjustments of presumptive sentences in the presence of aggravating or mitigating factors, a matter committed to the discretion of the sentencing court. *Jones v. State,* 771 P.2d 462, 467 (Alaska App.1989); *Juneby v. State,* 641 P.2d 823, 835 (Alaska App.1982), *modified on other grounds,* 665 P.2d 30 (Alaska App.1983). The factual findings regarding aggravators and mitigators must be upheld unless they are "clearly erroneous." *Juneby,* 641 P.2d at 834 & n. 17.

 Machado argues that nothing in the record demonstrates that more than three persons were at risk of injury in the car bombing. *See* AS 12.55.155(c)(6). The only ones at risk, aside from Machado and Taylor (who, as accomplices in crime, would not be counted), he argues, were Twogood and Neubauer. In finding this aggravator, Judge Johnstone stated that Machado's conduct jeopardized the safety of

> many others who may have been in the vicinity on a ... sunny Saturday ... when many people probably do go to auto parts or auto repair stores to get parts to work on their cars on weekends.... The testimony was that this was a fairly active parts yard, there were other people around.

He stated that the explosive device was "capable of killing people within a large radius." This finding is supported by the record. At trial, one of Twogood's employees testified that a windshield, presumably from Twogood's car, fell out of the sky approximately fifteen or twenty seconds after the explosion. Additionally, Dwight Steward, who was working in an office directly across Old Seward Highway from Twogood's wrecking yard, testified that the shock of the explosion shook the building he was in. Steward ran to the car which was engulfed by smoke and flames. Neubauer had exited the car, and Steward moved Twogood away before administering first aid because he feared a second explosion. Thus, it is clear that several other people were in the vicinity and that the explosion had force great enough to put at least a third person in danger. It cannot be said that Judge Johnstone's acceptance of this aggravator was clearly erroneous.

 In finding that Machado's conduct constituted "deliberate cruelty" under AS 12.55.155(c)(2), Judge Johnstone stated that

the defendant's conduct manifested deliberate cruelty to another by participating in the actual construction of the device ..., supplying the detonator and putting the bomb in the vehicle and leaving the scene before it went off. I find that by itself constitutes deliberate cruelty to another, including many others who may have been in the vicinity....

"Deliberate cruelty" is defined as "conduct which involves gratuitously inflicted torture or violence." *Jones v. State*, 765 P.2d 107, 109 (Alaska App.1988). However, when the relevant conduct "is merely a direct means to accomplish the crime charged," the conduct may not also be included as a separate aggravating factor. *Juneby*, 641 P.2d at 840. The state concedes that this finding was improper because the evidence does not support a finding of conduct by Machado, in addition to that necessary for the commission of the offenses, which could be considered "deliberate cruelty." The state's concession of error is well founded. *See Marks v. State*, 496 P.2d 66, 67–68 (Alaska 1972), and

Judge Johnstone's finding of "deliberate cruelty" was clearly erroneous.

 As Machado points out, Judge Johnstone found by "clear and convincing evidence" that Machado assisted authorities in their investigation of the other people involved in the car bombing. However, when the sentencing court finds a mitigator (or aggravator), it is not necessarily required to give it weight in adjusting the presumptive term. *Krasovich v. State*, 731 P.2d 598, 600–01 (Alaska App.1987); *Staael v. State*, 697 P.2d 1050, 1058 (Alaska App. 1985), *aff'd*, 718 P.2d 948 (Alaska 1986); *Juneby*, 641 P.2d at 838. Rather, modification of the presumptive term requires a two-step process. The court must first determine whether the mitigating or aggravating factor has been established by clear and convincing evidence; then, in its discretion, it must determine whether the factor justifies an adjustment of the presumptive term. *Jones*, 771 P.2d at 467; *Juneby*, 665 P.2d at 32 (modified opinion). A mitigator may be outweighed by the existence of other factors. In *Staael*, for example, the fact that the offender's prior felony was less serious than his present offense could be given little weight where the sentencing court chose to emphasize the goals of general deterrence and affirmation of community norms. 697 P.2d at 1058.

Here, Judge Johnstone concluded that Machado's sentence should be enhanced because of all of the aggravating factors which he found. However, he declined to reduce the sentence "in any manner because of the technical mitigating factor," pointing out that Machado's "assistance" also attempted to divert attention from his own role in the car bombing and thus in fact "hampered and hindered authorities." The judge also concluded that the sentence would not deter Machado because Machado had "shown a lack of remorse and ha[d] denied culpability." As in *Staael*, the judge emphasized the goals of general deterrence and affirmation of community norms. We conclude that Judge Johnstone was justified in refusing to adjust Machado's sentence downward in light of this mitigator.

Judge Johnstone found that Machado's perjury "was among the most serious conduct included in the definition of the offense." AS 12.55.155(c)(10). He stated:

> [T]he defendant lied under oath in an attempt to prevent the detection of his complicity in this offense. And had the lies gone undetected he would not have been brought to justice more than likely. The immunity agreement would have stood, and I consider that to be the most serious type of perjury: when somebody of Mr. Machado's makeup could, by lying under oath, absolve himself of any justice to prevent the state from prosecuting him.

Machado asserts that this conclusion lacks support in the record.

A finding that an offender's conduct "was among the most serious conduct included in the definition of the offense" must be "based on an assessment of the specific facts of each case, viewed in relation to the most serious potential conduct constituting the offense charged." *Juneby*, 641 P.2d at 841. "[A] person commits the crime of perjury if the person makes a false sworn statement which the person does not believe to be true." AS 11.56.-200(a). Significantly, Alaska's perjury statute extended the common law definition which required that the false sworn statement be material to an issue before the court. *Nelson v. State*, 546 P.2d 592, 594 (Alaska 1976); *Beckley v. State*, 443 P.2d 51, 54 (Alaska 1968). Machado's false testimony at the search warrant hearing concerned the events surrounding the car bombing, thus actually falling within this narrower definition of perjury and therefore among the more serious violations of the statute. Additionally, Machado's motive for giving the false testimony—to evade prosecution for his significant role in the car bombing—would also seem to make his offense particularly severe. We conclude that Judge Johnstone's finding that this aggravating factor applied to Machado's perjury offense was not clearly erroneous.

We next consider whether the forty-eight-year sentence which Judge Johnstone imposed was clearly mistaken. Machado had two prior felony convictions at the time of sentencing. Machado was on probation for another felony conviction at the time he committed the current offenses. Machado was an accomplice in an attempted contract killing which was carried out by placing a bomb in Andrew Twogood's car and detonating it. It is a mere fortuity that Twogood and Neubauer were not killed in the explosion. We believe that the record supports Judge Johnstone's conclusion that Machado's cooperation with the police was merely an attempt by Machado to evade his own responsibility. Machado succeeded in merely compounding his involvement through his perjury. Given Machado's prior record and the seriousness of his present offenses, we conclude that the sentence of forty-eight years of imprisonment was not clearly mistaken. However, since we have found that Judge Johnstone erred in finding the deliberate cruelty aggravator and since we have concluded that Machado's two perjury convictions should merge, Judge Johnstone must reevaluate the sentence in light of these conclusions. We do not require Judge Johnstone to conduct another sentencing hearing, although he may do so in his discretion.

We accordingly REMAND the case for resentencing; in all other respects, the conviction and sentence are AFFIRMED.