George L. MILLER, Appellant,

v.

STATE of Alaska, Appellee.

No. A–3954.

Court of Appeals of Alaska.

Jan. 7, 1994.

Blair McCune, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

Richard W. Maki, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

## OPINION

BRYNER, Chief Judge.

George L. Miller was convicted, following a jury trial, of first-degree robbery. Superior Court Judge Mark C. Rowland sentenced Miller to fifteen years' imprisonment. Miller appeals, claiming that the trial court erred in admitting evidence of uncharged misconduct by Miller, in allowing the prosecutor to comment improperly on this evidence during final argument, and in instructing on the manner in which the evidence could be used by the jury. Miller also claims that the trial court erred in refusing to grant a mid-trial motion for a bill of particulars and misinstructed the jury on accomplice liability. Finally, Miller claims that his sentence is excessive. We affirm.

## FACTS

In 1987, David and Mavis McClurg owned and operated a gold mine in northwest Alaska, near Kotzebue. They lived in Anchorage with their fifteen-year-old daughter Jackie and ran a jewelry shop in their house.

On September 21, 1987, Jackie McClurg was staying at the house while her parents were at the mine. In the evening, she got a phone call from a man who said he needed to drop off some papers for her father. Shortly after 10:00 p.m., a car pulled into the McClurgs' driveway, and a man wearing a red hat got out and came to the front door. As Jackie opened it, the man grabbed her, turned her around, and told her that he had a gun and this was a robbery. A second, shorter man followed the first man into the McClurg home. The men forced Jackie to take them downstairs to the jewelry shop, where they tied her up and began taking jewelry.

Just then, Belinda Nix and Gary Greener, friends of the McClurgs, drove up to the house. As Nix and Greener approached, they saw an unfamiliar car with a man behind the wheel in the driveway; the driver honked the horn and started to drive away.

Nix and Greener went into the house, where they saw the second, shorter man heading out the back entrance near the shop. Then the first, taller man pushed his way past Greener and went out the front door. Nix and Greener heard Jackie call out and found her tied up in the shop. They called the Alaska State Troopers, who eventually determined that more than $50,000 in gold and jewelry had been taken by the robbers.

Jackie McClurg identified the taller man as Dan Finnigan, a former employee at the McClurg mine. Earlier that day, Finnigan had come to the McClurgs' house and had tried unsuccessfully to collect wages for his work at the mine. Finnigan matched descriptions given the troopers by Nix and Greener.

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

Several days later, on September 24, 1987, the troopers arrested Finnigan for the robbery. They also arrested a friend of Finnigan's, Randy Ringler, whom they suspected as the second, shorter robber. Greener and Nix later identified Finnigan and Ringler as the two men they had seen in the McClurg's house.

In October of 1987, the troopers received word that a woman named Neva Johnson had been seen wearing a watch stolen from the McClurgs' shop. On October 21, 1987, they contacted Johnson, who said that her boyfriend, Michael Casalichhlio had given her the watch. When contacted by the troopers, Casalichhlio denied being involved in the robbery but turned over several stolen items that he admitted receiving from George Miller.

Casalichhlio eventually implicated Miller as the driver of the getaway car in the robbery. Casalichhlio also revealed that, soon after the robbery was committed, he accompanied Miller on an airline trip to Florida, using tickets purchased with robbery proceeds. The troopers also located two other friends of Miller, Aaron and Sue Foltz, to whom Miller had admitted participating in the robbery. Before the robbery, Aaron and Sue Foltz had also heard Miller planning the crime.

Information given to the troopers by Casalichhlio and the Foltzes also indicated that, prior to the robbery, Miller and Casalichhlio had engaged in a joint venture trafficking cocaine that Casalichhlio had obtained through a burglary involving a cocaine dealer. Casalichhlio evidently furnished the drugs to Miller, who was responsible for selling them; he would then share the proceeds with Casalichhlio. Finnigan, and to a lesser extent Ringler, had worked for Miller as runners, delivering cocaine and collecting money. Miller and Casalichhlio had planned to use profits from their cocaine sales to finance a trip to Florida, where they intended to buy two additional kilograms of cocaine for resale in Alaska. Miller, however, had begun to use cocaine heavily himself and had failed to collect enough money in sales to keep current on his payments to Casalichhlio. Prior to the McClurg robbery, he had become indebted to Casalichhlio for between $4,000 and $4,500. Finnigan, in turn owed a substantial sum of money to Miller. When it became apparent that there would be insufficient funds to finance the trip to Florida for additional cocaine, Miller hit upon the idea of the McClurg robbery as an alternative means to finance the Florida trip.

Based on the foregoing information, the state secured indictments charging Miller, Finnigan, and Ringler with the McClurg robbery and Casalichhlio with theft for receiving property stolen in the robbery. When the indictments were issued, Miller, who had never returned to Alaska from his trip to Florida, remained at large. Finnigan, Ringler, and Casalichhlio were tried and convicted.

Soon after the trial ended, however, Ringler wrote Finnigan a letter in which he (Ringler) acknowledged his own participation in the McClurg robbery but proclaimed Finnigan's innocence. Ringler identified himself as the second, shorter man in the robbery and claimed that the first, taller man had been Miller, not Finnigan. According to Ringler's letter, the driver of the getaway car had been someone named "Bill," whose last name he did not know.

As a result of Ringler's letter, Finnigan was awarded a new trial. Before the second trial, Miller, who had been arrested in Texas on a fugitive warrant, was extradited to Alaska. His trial was consolidated with Finnigan's second trial. At trial, the state relied primarily on its original theory of the case—that Finnigan had been the taller of the two robbers who entered the McClurg home and that Miller had been the getaway driver and had masterminded the robbery. Finnigan, relying on Ringler, defended on the theory that Miller had been the taller robber and that another, unknown man had driven the getaway car. Although Miller did not testify or present witnesses, he attempted to establish that none of the state's evidence against him was sufficiently credible to prove his participation in the robbery.

## EVIDENCE OF PRIOR MISCONDUCT

■ Over Miller's objection, the trial court allowed the state to present evidence at trial

that Miller, Casalichhlio, Finnigan, and Ringler trafficked in and used cocaine. The judge admitted the evidence because "[i]t defined the relationship between the parties at the time. It dealt with motive, plan, completed the history of the crime." Miller challenges this ruling on appeal, arguing that the evidence was inadmissible under Alaska Rules of Evidence 404(b) and 403.

Alaska Rule of Evidence 404(b) governs the admissibility of evidence of prior misconduct. A.R.E. 404(b)(1) states:

> Evidence of other crimes, wrongs, or acts is not admissible if the sole purpose for offering the evidence is to prove the character of a person in order to show that the person acted in conformity therewith. It is, however, admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.[1]

Under this rule, evidence of prior bad acts is categorically barred if it has no relevance apart from its tendency to establish the accused's propensity to engage in misconduct. If evidence of prior bad acts does have relevance to a material issue other than propensity, then it may be admitted, provided that its probative value outweighs its potential for prejudice. A.R.E. 403. *See Martin v. State,* 797 P.2d 1209, 1215 (Alaska App.1990).

Miller argues first that evidence of his cocaine dealing had no relevance apart from its tendency to establish criminal propensity. But this view is plainly incorrect. As the trial court properly determined, the evidence of Miller's cocaine use and dealing had a direct and obvious bearing on his motive to participate in the alleged robbery. Miller, however, cites cases that have disapproved the admission of evidence showing the accused's addiction to drugs as proof of motive. *See, e.g., Gould v. State,* 579 P.2d 535, 538 (Alaska 1978) and *Eubanks v. State,* 516 P.2d 726, 729 (Alaska 1973). These cases recognize that, since the desire for money is virtually universal and motivates most property crimes, it is a motive that can readily be understood by jurors, even in the absence of specific proof. For this reason, evidence that the accused needed money for a particularly reprehensible purpose such as the use of drugs, while potentially highly prejudicial, will add little on the issue of motive, at least unless the evidence establishes a particularized connection, or affirmative link, between the drug use and the charged offense.

Here, we think the evidence below plainly established an affirmative link between Miller's prior drug dealing and the McClurg robbery, since it supported the conclusion that Miller's drug dealings and the robbery were an integral part of a common scheme or plan. Indeed, under A.R.E. 404(b), the existence of a common scheme or plan amounts to an independent basis for admission of the disputed evidence.

The evidence of Miller's drug dealing tended to establish how the idea of the McClurg robbery was conceived and why the robbery was executed. Specifically, the evidence indicated that Miller's failed drug dealings, his debt to Casalichhlio, and Finnigan's debt to him, led directly to the McClurg robbery. Beyond this, the evidence also depicted both the drug dealing and the robbery as part of a more comprehensive plan to buy cocaine in Florida for resale in Alaska.

Miller correctly notes that the plan to rob the McClurgs was not even hatched until much of the cocaine dealing and use had already occurred. Miller contends that, for this reason, the robbery and cocaine trafficking cannot properly be characterized as part of a common scheme or plan. *See, e.g., Oswald v. State,* 715 P.2d 276, 280 n. 2 (Alaska App.1986) ("To be properly admissible under Rule 404(b) it is not enough to show that each crime was 'planned' in the same way; rather, there must be some overall scheme of which each of the crimes is but a part."), *overruled on other grounds, Yearty v. State,* 805 P.2d 987, 995 n. 3 (Alaska App.1991).

Here, however, as we have already observed, the evidence tended to show that the robbery originated in Miller's failure to generate sufficient funds through his drug dealings to carry through with his planned trip to

---

1. As the state notes, Alaska Rule of Evidence 404(b)(1) was amended by ch. 79, § 4, SLA 1991.

At the time of Miller's trial, it lacked the phrase "if the sole purpose for offering the evidence is."

buy greater quantities of drugs in Florida. The fact that the robbery had its source in the failed drug trafficking and that both the robbery and the drug trafficking were aimed at a common goal—to bankroll a larger drug enterprise—gave the disputed evidence legitimate relevance as proof of a common scheme or plan. *See, e.g., United States v. Hopkinson*, 492 F.2d 1041, 1043 (1st Cir. 1974). *See also* Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 3:21 at 54, 3.22 at 57 (1984) ("[T]he specific crime the defendant is charged with need not have been contemplated originally." "Even if the crimes are not predicated on each other, there may be a strong inference of a connected chain of crimes.").

■ The issue of motive and the existence of a common scheme or plan were not formal elements of the offense with which Miller was charged. Under the circumstances of this case, however, proof of motive and common scheme or plan were crucial and legitimate components of the prosecution's case. The disputed evidence bore directly on the primary issue in dispute at trial—Miller's identity as a participant in the robbery. The state had a strong need for this evidence. Miller had not been identified by any of the witnesses to the robbery. The state's efforts to establish his connection to the crime depended in large measure on its ability to show the robbery as an integral part of an overarching plan in which his participation was more clearly established.[2]

Because the disputed evidence had direct and obvious bearing on an actively disputed issue and was actually necessary to the state's case, we conclude that the trial court did not abuse its discretion in finding the evidence more probative than prejudicial under A.R.E. 403 and in allowing its admission.

## PROSECUTION'S CLOSING ARGUMENT

■ Miller next contends that the prosecution made numerous improper references to his prior drug dealings during its closing argument to the jury. To a large extent, however, Miller's argument is premised on a notion we have already rejected: that evidence of Miller's drug use was of dubious relevance and should not have been admitted in the first place. Moreover, Miller objected to the prosecution's closing argument at only one juncture:

We're in here searching for the truth. You are. And you are going to be the ultimate determiners of what happened to the facts. But don't hold it against the State because we gave immunity. Because, listen, Ladies and Gentlemen, people like Dan Finnigan and George Miller don't confess to crimes to people like yourselves.

The only people that they confess to crimes to and talk about their involvement in these type of things is people of their ilk, drug dealers, drug users.

At this point Miller's attorney objected:

Well, I have to object. I think that is drawing an improper witness statement as to improper inferences of guilt by association. That evidence wasn't admitted for that purpose.

THE COURT: Overruled. Overruled. I don't think it does that to begin with. And I think the argument was proper. You may continue.

As the trial transcript makes clear, the basis of Miller's objection was not that the prosecutor was improperly commenting on evidence of Miller's prior misconduct, but rather that the prosecution was raising "improper inferences of guilt by association," evidently by implying that Miller should be

---

**2.** The state's efforts also hinged on its ability to convince the jury of the credibility of testimony given by Casalichhlio and the Foltzes concerning various incriminatory statements Miller made before and after the robbery. We agree with the state that the credibility of these witnesses and the meaning of the statements they attributed to Miller could not have been fully established without revealing the relationship of the various parties and the context in which they spoke with

each other. This, in turn would amount to another independent justification for admission of the disputed evidence. *See, e.g., Braham v. State*, 571 P.2d 631, 640–41 (Alaska 1977); *Dulier v. State*, 511 P.2d 1058, 1061 (Alaska 1973); *McKee v. State*, 488 P.2d 1039, 1041 (Alaska 1971); *Ciervo v. State*, 756 P.2d 907, 911 (Alaska App. 1988), *overruled on other grounds, Swain v. State*, 817 P.2d 927, 933 (Alaska App.1991).

convicted for associating with "drug dealers, drug users."

However, this does not appear to be what the prosecutor was attempting to do. The prosecutor's argument was evidently aimed at convincing the jury that its own witnesses—Casalichhlio and the Foltzes—were credible in attributing admissions to Miller, despite the fact that they had themselves been shown to be "drug dealers, drug users" who had demanded immunity from prosecution in return for their testimony at trial. The point of the prosecutor's remarks, as we understand it, was essentially that, given the nature of the relationship between Miller, Finnigan, Casalichhlio, and the Foltzes, it was natural for Miller to have made the types of admissions Casalichhlio and the Foltzes attributed to him, and it would have been unnatural for him to make such admissions to anyone else.

Because it does not appear that the prosecution's argument raised "improper inferences of guilt by association," we find no error in the trial court's decision to overrule Miller's objection. Nor do we find plain error in the remaining portions of the prosecution's final argument, to which Miller raised no contemporaneous objection.

## INSTRUCTION ON PRIOR MISCONDUCT EVIDENCE

■ At the conclusion of the trial, the court gave the jury the following instruction concerning the manner in which it could consider the evidence of Miller's prior cocaine dealings:

> The jury, in the course of taking evidence, has heard evidence suggesting that the defendants used and distributed illegal substances. Mr. Miller and Mr. Finnigan are not on trial for drug offenses. This evidence should not be considered by you as evidence that the defendants are bad people and are, therefore, more likely to have committed the offenses with which they are charged. This evidence may only be considered by you as it may aid in determining whether or not the State has proven beyond a reasonable doubt the de-

fendants' guilt of the crime with which they are charged.

On appeal, Miller challenges this instruction, contending that its final sentence was vague, allowing the jury to consider the evidence of prior misconduct as proof of Miller's propensity to commit crimes. Miller points out that the instruction does not conform to Alaska Pattern Jury Instruction 1.43, which specifically informs the jury how to consider evidence of a prior crime. In particular, Miller emphasizes the concluding language of Pattern Instruction 1.43:

> For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.
>
> You are not permitted to consider such evidence for any other purpose.

Miller contends that this language should have been given to his jury. Miller's position, however, is curiously inconsistent with the position he took below. Miller objected at trial to an instruction proposed by the state that tracked Pattern Instruction 1.43 and specifically included the language Miller now claims should have been given. In response to Miller's objection, the trial court drafted the instruction Miller now finds objectionable; yet Miller failed to object to that instruction below.

During final argument to the jury, the prosecution repeated the reasons for the introduction of prior misconduct evidence, correctly informing the jury that it had been admitted only for purposes of showing motive, plan, and Miller's relationship to Casalichhlio, Finnigan, and Ringler. Also, Miller's trial counsel expressly cautioned the jury against misusing the prior misconduct evidence. While the challenged instruction was perhaps less than exemplary, we conclude that it did not amount to plain error.

## INSTRUCTIONS ON ACCOMPLICE LIABILITY

■ Miller next contends that the trial court's instructions on accomplice liability were deficient. Miller was evidently indicted on the theory that he was the getaway driver in the robbery. At trial, an element of confu-

sion as to Miller's role arose when Ringler testified that Miller and Ringler had entered the McClurg house together, that a third man named "Bill" had driven the getaway car, and that Finnigan was entirely innocent of the alleged crime.

In an attempt to address this· problem, the state sought jury instructions allowing Miller to be convicted as either an accomplice (for being the driver) or as a principal (for being one of the two men who had entered the house). The trial court, while initially receptive, ultimately decided that, since Miller had been indicted as an accomplice for driving the getaway car, he could be convicted only on that theory. The court fashioned its jury instructions accordingly, instructing the jury as follows:

The defendant, George Miller, is charged in Count I of the Indictment with robbery in the first degree. A person commits the crime of robbery in the first degree if the offense is committed by the conduct of another person for whom he is legally accountable.

A person is legally accountable for the conduct of another person constituting an offense if, with intent to promote or facilitate the commission of an offense, he aids or abets the other person in planning or committing the offense.

In order to establish that the defendant is legally accountable in this case the State must prove the following beyond a reasonable doubt:

First, that the event in question occurred on or about September 21, 1987, and at or near Anchorage, in the Third Judicial District;

Second, that the defendant, George Miller, acted knowingly and with the intent to promote or facilitate commission of the crime of robbery in the first degree;

Third, that the defendant aided or abetted another person in planning or committing the crime of robbery in the first degree; and

Fourth, that the person, who the defendant aided or abetted, in the course of taking or attempting to take property from the immediate presence and control of another, used or threatened the immediate use of force upon any person with the intent to prevent or overcome resistance to taking the property or retention of the property after taking, or to compel any person to deliver the property or engage in other conduct which might aid in the taking of the property and in the course of the taking or the immediate flight after the taking, the person, who the defendant aided or abetted, or another participant was armed with a deadly weapon or represented by words or conduct that any of the participants was so armed.

If you find from your consideration of all the evidence that each of these propositions has been proven beyond a reasonable doubt, then·you shall find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proven beyond a reasonable doubt, then you shall find the defendant not guilty.

Although Miller concedes on appeal that this instruction conforms with Alaska Pattern Jury Instruction 16.100–.110(2), and although he acknowledges that he failed to object to it, he claims plain error, arguing that the instruction was so vague that it allowed his conviction as a principal.

We find this argument meritless. Miller in effect posits that the jury might have convicted him as an accomplice for being a principal: he reasons that, under the challenged instruction, the jury might have found that he was one of the men who entered the McClurg house, might have concluded that the two robbers aided and abetted each other, and so might have convicted him as an accomplice.

This theory proceeds from a strained interpretation of the evidence and an attenuated reading of the challenged instruction. Moreover, the theory is premised on a fundamentally flawed view of accomplice liability, for it mistakenly assumes that a defendant indicted as an accomplice must be convicted as an accomplice and that it would therefore

have been error to allow the jury to convict him as a principal.

■ However, the legal distinction between principals and accomplices has long been abrogated in Alaska. *See* AS 11.16.110. *See also Morris v. State*, 630 P.2d 13, 15–16 (Alaska 1981); *Machado v. State*, 797 P.2d 677, 685–86 (Alaska App.1990). It is well-settled that a defendant charged as a principal may be convicted as an accomplice; the converse is also true.[3] *Scharver v. State*, 561 P.2d 300, 302 (Alaska 1977); *Totemoff v. State*, 866 P.2d 125 (Alaska App.1993). *See generally* 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law*, § 6.6(d)(2) at 131 (1986).

■ Here, the trial court, evidently accepting Miller's argument that a contrary result would be legally impermissible, sought to limit the state to the original theory upon which it indicted Miller: that Miller was guilty of robbery as an accomplice for driving the getaway car. As a matter of law, however, Miller was properly subject to conviction as either a principal or as an accomplice. Hence, even if the jury instructions did not succeed in narrowing the charge to accomplice liability and allowed Miller to be convicted as a principal, plain error could not be found.[4]

## SENTENCING ISSUES

Miller contends that his sentence was improperly imposed and is excessive. First-degree robbery is a class A felony. AS 11.41.500(b). Miller had previously been convicted of second-degree criminal mischief, a felony; as a second felony offender, he was subject to a presumptive term of ten years' imprisonment. AS 12.55.125(c)(3). Judge Rowland found three of the aggravating factors specified in AS 12.55.155(c) applicable to Miller's case: that Miller's conduct had created a risk of imminent physical injury to three or more persons (factor (c)(6)); that Miller had a history of repeated instances of assaultive behavior (factor (c)(8)); and that Miller was on felony probation when he committed the robbery (factor (c)(20)). Based on these aggravating factors, Judge Rowland sentenced Miller to an enhanced presumptive term of fifteen years.

In imposing sentence, Judge Rowland briefly summarized Miller's extensive criminal history and, in the course of doing so, mentioned Miller's previous involvement in a robbery for which he had not been convicted.[5] Judge Rowland's reference to the prior robbery was evidently based on the presentence report, which disclosed that in 1978 Miller had been an accomplice in an armed robbery but had received immunity in ex-

---

**3.** Miller's confusion on this score centers on *Michael v. State*, 805 P.2d 371 (Alaska 1991), the sole case he relies on to support his argument on this issue. *Michael*, however, is readily distinguishable. There the supreme court found a fatal variance between the indictment and the evidence at trial when an offender was convicted of a crime that was not charged in the indictment, based on a legal and factual theory that had not been presented to the grand jury. No question of accomplice liability was presented in that case.

**4.** Our resolution of this issue also disposes of Miller's related claim that the trial court erred in denying his mid-trial motion for a bill of particulars, which sought to narrow his indictment to charge him as the driver of the getaway car. The fact that the jury instructions pertaining to Miller ultimately addressed only accomplice liability rendered Miller's motion for a bill of particulars moot. As we have indicated, even if the instructions did not succeed in limiting the jury to the original accomplice liability theory, Miller was

properly subject to conviction as either a principal or as an accomplice. Thus, he was not entitled to a bill of particulars narrowing the charge.

**5.** Judge Rowland said:

Before the court is George L. Miller who's now 36 years old. He's here on his second felony offense which figures a presumptive sentencing scheme. The defendant has an extensive criminal history going back many, many years to his—back to his juvenile years in which—during which time there were serious crimes committed. There are as I—many convictions and it's apparent that previously he was involved in a robbery, although he was not convicted of that crime. The defendant has a demonstrated capacity for violence, cruelty and assaultive conduct, the latest assault occurring as recently as December 1988. The defendant has been involved in narcotics as demonstrated by the testimony in this case. I don't need to go over that at this time.

change for his testimony against other participants.[6]

Miller now asserts that he in all likelihood received transactional immunity for his testimony concerning the prior robbery and that, for this reason, Judge Rowland's consideration of the prior robbery amounted to a violation of both the immunity agreement and of Miller's privilege against self-incrimination.

Miller never raised this issue at the sentencing hearing. He did not move to strike the information concerning the prior robbery from the presentence report, nor did he object to Judge Rowland's mention of the incident. Furthermore, Miller has presented nothing to establish the nature and terms of the immunity agreement that he entered into with the state.

Without further information, it would be wholly speculative for this court to conclude that Judge Rowland's consideration of the prior robbery violated Miller's rights under the agreement. Moreover, the prior incident was merely mentioned by Judge Rowland as one of many acts of misconduct included in Miller's lengthy criminal history. We decline to find that Judge Rowland's passing reference to the prior robbery amounted to plain error.

Miller further asserts that Judge Rowland erred in finding aggravating factor (c)(6) applicable to his case: that Miller's conduct created a risk of imminent physical injury to three or more persons other than accomplices. According to Miller, the evidence does not support the conclusion that Greener and Cox—who entered the McClurg house while the robbery was in progress—were placed at risk, since it was undisputed that the robbers who were in the house left immediately upon Greener's and Cox's arrival.

The evidence also indicated, however, that one of the robbers was armed with a stun gun. He encountered Greener and Cox while making his exit and pushed past both of them. In the course of doing so, he grabbed Greener's head and shoved him out

of the way. In our view, this evidence was sufficient to allow Judge Rowland to conclude that, even though Greener and Cox were not actually injured, both were placed in imminent risk of injury. The court's finding that factor (c)(6) applied is not clearly erroneous.

Miller lastly asserts that his fifteen-year term is excessive. He suggests that Judge Rowland's decision to enhance the applicable ten-year presumptive term by five years was "overzealous" and at odds with the "measured and restrained approach toward adjustment of presumptive terms" that this court counseled in *Juneby v. State*, 641 P.2d 823 (Alaska App.1982), *modified on other grounds*, 665 P.2d 30, 31–34 (Alaska App. 1983).

However, Miller stood convicted of an armed robbery that involved the theft of more than $50,000 in jewelry. The robbery, which involved three persons, was carefully planned; the evidence at trial suggested that Miller was primarily responsible for planning it. The apparent purpose of the robbery was to fund another criminal venture. In the course of the robbery, Jackie McClurg was incapacitated and held captive. Although her captivity was brief—due to the fortuitous arrival of Greener and Cox—the situation obviously involved a significant risk of injury.

Miller's criminal history is extensive, dating back to his youth; it includes several convictions for assaultive behavior. He has consistently failed at rehabilitation and was on felony probation when he committed this offense. At sentencing, Miller claimed innocence and insisted that he had been framed.

Considering the totality of the sentencing record, Judge Rowland could properly find that Miller was a dangerous offender with poor prospects for rehabilitation. Judge Rowland could also properly find that, under the circumstances, a sentence emphasizing community condemnation and isolation was appropriate. Having independently reviewed the entire sentencing record, we conclude that the sentence imposed below is not clear-

---

6. The prior robbery is described (and Miller's immunity mentioned) in *Miller v. State*, 629 P.2d 546 (Alaska App.1981).

ly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

CONCLUSION

The conviction and sentence are AFFIRMED.

MANNHEIMER, J., not participating.