STATE of Alaska, Appellant,

v.

Amelia T. HERNANDEZ, Appellee.

No. A–4380.

Court of Appeals of Alaska.

July 29, 1994.

William H. Hawley, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellant.

Rex Lamont Butler, Anchorage, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

Amelia Hernandez was convicted by a jury of one count of assault in the second degree, one count of assault in the third degree, and two counts of assault in the fourth degree. Superior Court Judge Larry R. Weeks imposed a composite sentence requiring Hernandez to serve one year of unsuspended time in jail and specifying that she could fulfill eight months of the unsuspended term by performing community work instead of actually serving time in jail. This left Hernandez four months of actual jail-time to serve. The state has appealed, arguing that Hernandez' sentence is too lenient. We agree and, accordingly, disapprove the sentence.[1]

---

1. Under AS 12.55.120(b), when the state appeals    a sentence as too lenient, and the defendant does

## FACTS AND PROCEDURAL BACKGROUND

### 1. *The Offenses*

Hernandez' convictions stem from injuries that she recklessly inflicted against three children who were entrusted to her care when she operated an unlicensed daycare center in Juneau. Hernandez began providing daycare after moving to Juneau in 1983. On February 6, 1987, twenty-one-month-old S.O. suffered a broken leg while in Hernandez' care. The injury went undetected until S.O.'s parents picked S.O. up at the end of the day. Hernandez claimed that another child must have fallen or jumped on S.O.'s leg. Evidently alerted by this incident, Community Care Licensing Specialist Alice Da-Costa called on Hernandez at home in February 1987. DaCosta discovered that Hernandez had eleven children under the age of six in her care. DaCosta instructed Hernandez that unlicensed daycare providers were prohibited from having charge of more than four children. DaCosta encouraged Hernandez to become licensed and instructed her to reduce to no more than four the number of children in her care.

However, Hernandez took no steps to secure a license. The following month, in March 1987, DaCosta wrote to Hernandez, reminding her of the licensing requirement, enclosing information concerning the licensing process, and asking whether Hernandez planned to become licensed. Hernandez did not respond and continued to operate her daycare business.

In October 1989, a visitor at Hernandez' home observed at least eleven young children in her care. On approximately October 31, 1989, Hernandez caused physical injury to one of these children, three-year-old M.C., by grabbing M.C. by the neck and squeezing. Hernandez' actions caused M.C. to become hysterical and urinate. The force used by Hernandez was sufficient to leave bruises on M.C.'s neck.

On September 17, 1990, while in Hernandez' care, three-month-old M.R. sustained a forceful blow to her head that resulted in a life-threatening skull fracture. Although M.R. was obviously injured and unresponsive, Hernandez did not report the injury or seek medical care for the infant. When M.R.'s mother came to pick her baby up, she noticed that M.R.'s head was swollen and that M.R. was limp and lethargic. She immediately took M.R. to the hospital. The infant was found to be in critical condition upon admission.

In the immediate aftermath of the incident, Hernandez gave varying accounts to different people but consistently denied that M.R. had sustained any injury while in her care. Discovery of M.R.'s fractured skull was delayed for several hours due to Hernandez' insistence that nothing traumatic had happened to the child. Once the skull fracture was revealed, M.R.'s Juneau physician decided that it was necessary to evacuate M.R. to Seattle, where a neurosurgeon would be available for further treatment. M.R.'s parents were forced to travel to Seattle to be with their daughter. M.R. remained hospitalized there for a prolonged period but eventually recovered. Although M.R.'s prognosis was favorable by the time of Hernandez' trial—approximately one year later—the possibility of future neurological complications due to her injury could not be ruled out.

Within ten days of M.R.'s injuries, the police visited Hernandez' home on two occasions. On September 20, 1990, three days after the incident, they found that, in addition to her own two daughters (who were then twelve and seven years old), Hernandez was providing care for eleven children—two were six years old; the rest were three years old or younger. On September 26, Hernandez was revisited and was found to be in charge of seven children, not counting her own daughters. Hernandez was cited on both occasions for providing illegal daycare. She entered no-contest pleas to the charges on October 25 and was ordered to pay a fine and to complete a one-year period of probation.

not appeal the sentence as excessive, this court may only approve or disapprove the sentence and has no authority to increase it.

Within days of pleading no contest and being sentenced—sometime between October 29 and November 9, 1990—Hernandez bruised and scratched seven-month-old S.P. about the head and body. During the same period, Hernandez inflicted injuries to S.P.'s mouth, tongue, and throat with a dangerous instrument, most likely by jamming a spoon down his throat. By the time S.P.'s parents discovered these injuries, S.P.'s mouth had become severely infected and required emergency-room treatment.

Based on these incidents and several others, Hernandez was charged by indictment with eight counts of assault (in varying degrees) and one count of reckless endangerment. Hernandez' first trial resulted in an acquittal on four of the assault counts (including the count charging her with assault for breaking S.O.'s leg in 1987) and a conviction on the reckless endangerment count; the jury deadlocked on the four remaining assault charges.

After a second trial, Hernandez was convicted of the remaining charges: for the injuries Hernandez inflicted to M.C.'s neck in 1989, Hernandez was convicted of fourth-degree assault—recklessly causing physical injury to another person in violation of AS 11.41.230(a)(1); for breaking M.R.'s skull in September of 1990, Hernandez was convicted of assault in the second degree—recklessly causing serious physical injury to another person in violation of AS 11.41.210(a)(2); for bruising and scratching S.P., Hernandez was again convicted of fourth-degree assault—recklessly causing physical injury; and for injuring S.P.'s mouth, tongue, and throat, she was convicted of third-degree assault—causing physical injury by means of a dangerous instrument in violation of AS 11.41.220(a)(2).

### 2. The Offender

At the time of sentencing, Hernandez was forty-five years of age. Little is known of Hernandez' childhood, because she did not provide information to the presentence investigator. Apparently, Hernandez graduated from high school and worked initially as a hairdresser in California. Hernandez married Roberto Hernandez, Jr., and the couple later moved to Texas, where Hernandez, at some point, began providing daycare in her home. The couple moved to Juneau in 1983, when Roberto Hernandez, an I.R.S. agent, transferred to the Juneau I.R.S. office. Upon moving to Juneau, Hernandez continued to provide daycare services in her home.

Hernandez has two children, daughters, who were nine and fourteen years old at the time of sentencing. There is no indication that Hernandez has ever abused or mistreated her own children. With their combined incomes, the Hernandezes maintained a seemingly stable and prosperous lifestyle. Hernandez was well liked in Juneau, and she received strong support from friends and acquaintances in the community, many of whom wrote to the sentencing court in Hernandez' behalf expressing disbelief at her charges and conviction. Apart from her 1990 convictions for providing illegal daycare, Hernandez had no prior criminal record.

Despite these favorable characteristics, a psychological evaluation prepared for sentencing at the request of Hernandez' counsel provided substantial cause for concern about Hernandez' capacity for rehabilitation. Dr. Doleshal, who prepared the report, found Hernandez to be "suspicious, defensive, and tense" during the evaluation, and he concluded that "she did not cooperate with the evaluation in a forthright manner." Doleshal's overall evaluation was that Hernandez

> is highly resistive to self-disclosure primarily due to rigidly neurotic psychological defenses. Her judgement and comprehension also appear to be compromised because of cultural and intellectual factors. All of these dynamics are coalesced in her guarded, apprehensive and distrustful personality style concealing much of the "truth" about her family dynamics, behavior, beliefs and life style. Such individuals do not permit much "access" into their true character[.]

Doleshal believed that "the dynamic of overcontrolled hostility may have played a role" in Hernandez' offenses. He theorized

> that most of the time [Hernandez'] rigid defensive structure "keeps the lid on her behavior," however the danger of such a coping mechanism is that in rigidity there

is little opportunity for release and under the wrong circumstances pressures could build to intolerable levels. Under such conditions one might not be able to contain the inner anger and tension and it could be impulsively acted out. Afterwards, the same rigid defensive structure would shut tight in guilt and denial of the actions.

Doleshal nonetheless commented that he did not think incarcerating Hernandez would serve any useful purpose:

> While through poor judgement, neurotic processes, overextending her resources, simple naivete or all of the above, she may have played a role in the charges for which she was indicted, she probably would have a hard time comprehending her culpability. Clearly, she should not be allowed to perform any further daycare activities and probationary monitoring would be prudent. If she is not doing daycare or any daycare like activities, she does not pose any threat. Incarceration would likely do little to enhance her insight vis a vis any responsibility she may have had in these matters. While it holds some punitive relevance, it likely would be lost on [Hernandez].

### 3. The Sentencing

Hernandez' second-degree assault conviction for breaking M.R.'s skull amounted to a class B felony and, as such, was punishable by a maximum term of ten years in prison. AS 11.41.210(b); AS 12.55.125(d). Her conviction of third-degree assault for injuring S.P.'s mouth, tongue, and throat was a class C felony and was punishable by a maximum of five years in prison. AS 11.41.220(b); AS 12.55.125(e). The fourth-degree assault convictions for injuring S.P. and M.C. were class A misdemeanors, punishable by maximum terms of one year in jail. AS 11.41.230(b); AS 12.55.135(a).

At the sentencing hearing, Hernandez insisted that she had done nothing wrong; in allocution, her only statement was, "I am not guilty." Because Hernandez had no prior felony convictions, she was not subject to presumptive sentencing. The state nevertheless requested Judge Weeks to impose a composite term exceeding the four-year presumptive term applicable to second felony offenders convicted of class B felonies. In support of this request, the state alleged several aggravating factors.[2] Judge Weeks found two of the alleged factors to be established by clear and convincing evidence: that Hernandez' victims were particularly vulnerable by virtue of their extreme youth (AS 12.55.155(c)(5)), and that Hernandez' criminal history included prior conduct involving aggravated or repeated instances of assaultive behavior (AS 12.55.155(c)(8)).

In concluding that the latter aggravating factor had been established, Judge Weeks expressly found, by clear and convincing evidence, that Hernandez had committed the assaults that she was acquitted of by the first jury, including the 1987 assault in which S.O.'s leg was broken.[3] In addition, although rejecting the state's contention that Hernandez' assault on M.R. was among the most serious included in the definition of second-degree assault, see AS 12.55.155(c)(10), Judge Weeks expressly found that "the nature of this second degree assault is more serious than your typical second degree assault."

Despite these findings, Judge Weeks suspended the imposition of Hernandez' sentence for ten years on the second-degree assault charge, ordering Hernandez to serve one year in jail as a special condition of the suspended imposition of sentence. Judge Weeks also ordered Hernandez to complete five years of probation and to refrain from having custody of any children other than her own for ten years. On Hernandez' third- and fourth-degree assault charges, Judge

---

2. See Wylie v. State, 797 P.2d 651 (Alaska App. 1990) (generally requiring the state to allege and prove statutory aggravating factors when it seeks the imposition of a first-offense sentence exceeding the presumptive term specified for a second-felony offender convicted of the same offense).

3. See Brakes v. State, 796 P.2d 1368, 1372 (Alaska App.1990) (allowing sentencing court to find

aggravating factors based on conduct for which the defendant was acquitted in light of the different burdens of proof applicable in determining guilt and establishing an appropriate sentence); Buoy v. State, 818 P.2d 1165, 1167–68 (Alaska App.1991) (holding clear and convincing evidence standard applicable to sentencing court findings under Brakes).

Weeks imposed sentences totaling eighteen months' imprisonment with twelve months suspended. Judge Weeks allowed the six months of unsuspended time for these offenses to be served concurrently with six months of Hernandez' one-year term for second-degree assault, yielding a total unsuspended term of one year.[4] The judge further specified that Hernandez would be permitted to perform community work in lieu of eight months of the unsuspended jail term, at the rate specified in AS 12.55.055(d).[5] This left Hernandez only four months of actual jail-time.

Hernandez appealed her conviction on a variety of grounds; the state appealed the sentence, claiming that it was too lenient. In *Hernandez v. State*, 626 So.2d 1349 (Alaska App., 1993), we affirmed Hernandez' conviction. We now address the state's sentence appeal.

## DISCUSSION

Although Hernandez was convicted of, and sentenced for, four separate assaults involving three different victims, the appropriateness of her total sentence can most readily be analyzed by focusing on her most serious offense—the second-degree assault of three-month-old M.R.—and by viewing her remaining offenses as reflecting on the seriousness of that crime.

Hernandez' assault on M.R. was a class B felony. In *State v. Jackson*, 776 P.2d 320 (Alaska App.1989), we conducted an extensive survey of sentencing decisions involving first-felony offenders convicted of class B felonies. We found that these cases fell into four distinct sentencing ranges:

1. A typical offender committing a typical or moderately aggravated offense should receive an unsuspended term of a year or more to serve. The upper limit in such cases should be four years....

2. For an offense that is exceptionally aggravated—one that involves the existence of significant statutorily specified aggravating factors or other extraordinarily aggravated circumstances—a term of up to six years of unsuspended incarceration....

3. For a case that is less serious than the norm for the offense, either because it involves mitigated conduct or an offender whose background indicates particularly favorable prospects for rehabilitation, a nonprobationary sentence below the one-year to four-year range for typical offenses will be appropriate....

4. A probationary sentence—a term involving less than ninety days of unsuspended incarceration—should be reserved for cases that are significantly mitigated in terms of both the offender and the offense....

*Id.* at 326–27 (footnotes omitted).

Hernandez' total sentence included a year of unsuspended incarceration, a term that at first blush appears to place her near the bottom of the one- to four-year range established by *Jackson* for typical first offenders convicted of typical class B felonies. Two aspects of Hernandez' sentence, however, actually place her below the typical range. First, the sentencing court expressly permitted Hernandez to fulfill eight months of her unsuspended sentence by performing community service in lieu of spending time in jail. Her sentence leaves her with only four months of unsuspended jail time to serve.[6]

4. Judge Weeks concluded that Hernandez' conviction by the first jury for reckless endangerment merged with her assault convictions. Accordingly, the judge did not impose a separate sentence for this offense. The ruling is not disputed in this appeal. Judge Weeks also ordered Hernandez to pay restitution to the families of her victims.

5. AS 12.55.055(d) authorizes sentencing judges to allow defendants to perform community work in lieu of imprisonment at the rate of eight hours of work per day of imprisonment.

6. Although AS 12.55.055(d) gives sentencing courts broad discretion to allow offenders the option of substituting community work for incarceration, our decision in *Jackson* concluded that "the language of AS 12.55.055(d) makes it reasonably clear that the legislature did not regard community work as the functional equivalent of incarceration in all situations." *Jackson*, 776 P.2d at 329. In a purely technical sense, AS 12.55.055(d) makes a sentence of four months in jail and 240 eight-hour days of community work the legal equivalent of a continuous one-year jail term. When viewed in terms of established sentencing goals such as deterrence and community

Second, the sentencing court suspended the imposition of Hernandez' sentence on the second-degree assault charge, a disposition that is usually advantageous to defendants and, hence, peculiarly suited to mitigated cases: "By its very nature, . . . a suspended imposition of sentence is primarily meant to be a one-time opportunity for particularly deserving first-offenders." *State v. Huletz,* 838 P.2d 1257, 1259 (Alaska App.1992).

Realistically viewed, then, Hernandez' composite sentence was substantially more lenient than would be typical for a first offender convicted of a single class B felony. Her total sentence falls toward the bottom of *Jackson*'s third benchmark category, which encompasses nonprobationary sentences below the one-year to four-year range for typical offenses. *Jackson,* 776 P.2d at 326.[7] This sentence would normally be appropriate for a first offender convicted of a class B felony only in "a case that is less serious than the norm for the offense, either because it involves mitigated conduct or an offender whose background indicates particularly favorable prospects for rehabilitation." *Id.*

The pertinent question thus becomes whether Hernandez' case is in some discernible way less serious than a typical first-offense class B felony. The answer to this question depends on the offender, the nature of the offense, and the resulting harm: "in determining whether a case is aggravated or mitigated, the sentencing court must consider the totality of the circumstances relating to the background and personal characteristics of the offender, the seriousness of the conduct involved in the commission of the offense, and the nature and extent of the resulting harm." *Huletz,* 838 P.2d at 1259.

■ The information in the record pertaining to Hernandez' background and personal characteristics reveals little to suggest the appropriateness of a sentence more lenient than the norm for a first-felony offender convicted of a class B felony.

As the sentencing court correctly found, despite the absence of a formal criminal record, Hernandez had a history of prior assaultive conduct similar to that for which she was convicted in this case. For many years, despite express warnings, Hernandez knowingly (almost defiantly) provided daycare in her home for an impermissibly large number of children; at the same time, she persistently refused to seek a license for her business. Hernandez continued to provide daycare in crowded and unsafe conditions in spite of several incidents that resulted in injuries to children, including the serious 1987 incident in which twenty-one-month-old S.O.'s leg was broken.

The record contains nothing to indicate that Hernandez' prospects for rehabilitation are particularly favorable. Hernandez completely denied any involvement in or responsibility for the offenses for which she was convicted. She evidently attempted to manipulate and/or mislead the psychologist who prepared her psychological evaluation. The psychological evaluation itself was largely negative, containing little if anything to support a finding that Hernandez' prospects for rehabilitation are better than those of a typical first-felony offender. Dr. Doleshal gave no indication that Hernandez might be amenable to some form of treatment or rehabilitation; indeed, his portrayal of Hernandez' entrenched denial and his conclusion that she is unlikely even to appreciate the deterrent message of a prison sentence strongly suggest the contrary.

On the whole, the information in the record pertaining to Hernandez' background and personal characteristics indicates that Hernandez' prospects for rehabilitation are

condemnation, however, these sentences cannot realistically be equated.

7. Although, as we have indicated, a suspended imposition of sentence is usually associated with a particularly mitigated offense, we do not suggest that suspended impositions of sentence should invariably be deemed to result in a more lenient sentence or that their use is categorically limited to mitigated cases. *See* footnote 9, *infra.*

Our characterization of Hernandez' sentence as falling below the *Jackson* benchmark for typical first-offense class B felonies is based not so much on the superior court's use of a suspended imposition of sentence as on its use of a suspended imposition of sentence in combination with a relatively brief term of incarceration and a provision allowing community service in lieu of two-thirds of the jail term that the court imposed.

perhaps somewhat less favorable, and certainly no more favorable, than those of a typical first offender convicted of a class B felony. Notably, in imposing Hernandez' sentence, Judge Weeks did not purport to find otherwise.

Consideration of the seriousness of Hernandez' conduct likewise reveals no basis for imposing a mitigated sentence. As previously mentioned, Hernandez was convicted not just for the single class B felony assault on M.R., but also for three lesser assaults involving two other children. In addition, the sentencing court found, by clear and convincing evidence, that Hernandez had committed the assaults of which she had been acquitted. All of these incidents involved victims who were particularly vulnerable by virtue of their extreme youth.

According to the expert testimony at Hernandez' trial, the most serious incident of assault for which Hernandez was convicted, the assault resulting in M.R.'s broken skull, involved an extraordinary amount of force—force equivalent to an automobile accident. Furthermore, Hernandez' last two assaults, the third- and fourth-degree assaults on six-month-old S.P., occurred mere days after Hernandez had entered no-contest pleas to charges of providing illegal daycare.

The fact that Hernandez acted recklessly rather than intentionally cannot support the conclusion that her conduct was less serious than the norm for her offenses. As defined by the statutes under which Hernandez was convicted, assault consists of recklessly inflicting physical injury on another person.[8] Hence, by definition, "such reckless conduct is squarely within the norm for assault." *Huletz*, 838 P.2d at 1259.

Judge Weeks, addressing only Hernandez' second-degree assault on M.R., justifiably found that Hernandez' conduct was more serious than typical for a class B felony. Considering the totality of the offenses for which Hernandez was convicted, there is simply no basis for concluding that her conduct

is less serious than the norm for a first-offense class B felony.

We lastly turn to the harm resulting from Hernandez' crimes. Hernandez' assaults involved three separate victims. The physical harm resulting from Hernandez' assault on M.R. was extraordinarily serious, certainly surpassing the harm involved in a typical case of second-degree assault. In addition to the physical harm Hernandez inflicted on her victims, the sentencing record establishes that the families of two of the victims, M.R. and S.P., were profoundly affected by her crimes, experiencing severe emotional trauma and financial hardship. In some cases, the fact that an offender's conduct occasioned only minimal harm might justify the imposition of a lenient sentence; Hernandez' case, however, is plainly not such a case.

In short, whether we view Hernandez' case from the standpoint of her personal background, the seriousness of her conduct, or the resulting harm, we find nothing to indicate that her case called for the imposition of an unusually lenient sentence. Indeed, from each of these three standpoints, a plausible argument could be made that Hernandez deserved more severe, not lenient, treatment than is typically accorded to first-felony offenders upon conviction of class B felonies.

Hernandez nevertheless received a total sentence that is palpably more lenient than the norm for similarly situated offenders. As reflected by our decision in *Jackson*, among first offenders convicted of class B felonies, comparably lenient treatment has traditionally been reserved for offenders whose cases were mitigated in some significant respect. Here, the sentencing court did not purport to find that Hernandez' prospects for rehabilitation were particularly favorable; or that her conduct was in any respect less serious than normal for a class B felony; or that it resulted in insubstantial harm. Nor did the court articulate any other justification for the imposition of a sentence that is unusually lenient in comparison with

8. Under AS 11.41.210(a)(2), second-degree assault occurs when the defendant recklessly causes serious physical injury to another person. Under AS 11.41.220(a)(2), third-degree assault occurs when the defendant recklessly causes physical injury to another person by means of a dangerous instrument. Under AS 11.41.230(a)(1), fourth-degree assault occurs when the defendant recklessly causes physical injury to another person.

sentences traditionally imposed in comparably serious cases.

Sentencing certainly demands more than a comparison of one offender to another. It is a complex, dynamic and multifaceted process that requires decisions to be based on the individual facts of each case. And so, guidelines such as those established in *Jackson* are not static. They are descriptive rather than prescriptive, reflecting historical trends rather than establishing future imperatives. Courts—sentencing courts and this court alike—must thus remain sensitive to change and receptive to the possibility that, in any given case, unique facts, unusual circumstances, or evolving social norms may justify a departure from historically established sentencing practices.

But despite the undeniable complexity of sentencing decisions and the large measure of subjective judgment they inevitably require, our legal system is committed to the notion that sentencing is ultimately a rational process—that sentences ought to be based not on the sentiment of the moment or on some inarticulable predilection of the sentencer, but on sound reasons based in law, reasons capable of being articulated. If unique reasons exist for imposing a unique sentence, those reasons cannot go unspoken.

■ Precisely because sentencing is an individualized process, the sentencing court has an obligation to explain its reasons for selecting a particular sentence. *State v. Chaney*, 477 P.2d 441 (Alaska 1970). A sentencing judge who perceives unique circumstances warranting a unique sentence must identify those circumstances and explain their significance in relation to the established goals of sentencing in terms that can be understood by the defendant, the prosecutor, and the public:

At a minimum, ... the principle of reasonable sentencing uniformity requires a sentencing judge who decides that an offender deserves a sentence which is significantly different from sentences previously given to similarly situated offenders to expressly find some legitimate basis for the difference—some basis related to "legally relevant sentencing criteria." That basis should be spelled out on the sentencing record, so that the defendant and a reviewing court can understand the reasons for the disparity.

*Williams v. State*, 809 P.2d 931, 935 (Alaska App.1991) (citation omitted). In the present case the sentencing court articulated no unusual circumstances justifying the unusually lenient sentence it imposed, and our independent review of the record discloses none.

■ The sentencing goals to be considered in each case include rehabilitation, individual and general deterrence, the reaffirmation of societal norms, that is, the expression of community condemnation, and isolation of the offender to assure public safety. *Chaney*, 477 P.2d at 443–44. Here, Hernandez stands convicted of multiple assaults involving three different victims; her most serious crime is a class B felony. Given the nature and seriousness of the crimes involved in this case, we fail to see how a sentence requiring Hernandez to serve only four months in jail can provide any realistic deterrence to potential offenders. We similarly fail to see how such a sentence can adequately reaffirm societal norms and express community condemnation for misconduct of the magnitude involved in this case.

■ Certainly, when all sentencing goals cannot be perfectly met in a given case, it is the sentencing court's prerogative to determine the priority each goal should receive. *Nicholas v. State*, 477 P.2d 447, 448–49 (Alaska 1970). The goals of general deterrence and reaffirmation of societal norms may properly be subordinated when competing goals are deemed more important in a given case. Particularly in the case of a first offender—even a first offender convicted of a serious felony—the sentencing goal of rehabilitation may deserve priority if it conflicts with other goals.

■ But while the need to give priority to one sentencing goal may well justify the subordination of others that stand in conflict with it, emphasizing a single sentencing goal to the exclusion of others can never be justified in the absence of actual conflict among the goals. In the present case, the sentencing court's failure to adequately address the goals of general deterrence and community

condemnation cannot be attributed to a conflict between those goals and others, for no conflict was found, and none existed.

Given Hernandez' relatively poor prospects for rehabilitation, it does not appear that an unusually lenient sentence was either necessary or appropriate to serve the goal of rehabilitation. The sentencing court did not find, nor does anything in the record suggest, that a longer sentence would have impeded Hernandez' rehabilitation. Indeed, the sentencing court's findings give no indication that rehabilitation played a determining role in its sentencing decision. The court appears to have accepted Dr. Doleshal's conclusion that Hernandez' prospects for rehabilitation were limited and that the possibility of future misconduct by Hernandez could be better addressed through prevention than through rehabilitation.

In this regard, the record does indicate that Hernandez' conduct could be controlled on probation and that she would likely pose little danger to the public if kept under supervision to assure that she does not take charge of other families' children in the future. We recognize, as well, that Dr. Doleshal's psychological evaluation expressed skepticism as to whether incarceration could have any deterrent effect on Hernandez. To this extent, the sentencing court could properly have concluded that a sentence more severe than the one it imposed was not necessary for purposes of individual deterrence and that public safety could adequately be assured by a lengthy period of probation.[9]

In no respect, however, would a more substantial sentence have conflicted with the fulfillment of these goals; they would as readily have been met had the court imposed a sentence calculated to promote general deterrence and express societal condemnation.

## CONCLUSION

Our independent review of the record convinces us that the sentence imposed below does not sufficiently address the sentencing goal of general deterrence and is "ill-suited to express community condemnation for the type of violent crime involved in this case." *Huletz*, 838 P.2d at 1260. In the absence of articulated or articulable grounds for mitigation, the sentencing court's choice of an unusually lenient sentence "unduly depreciate[d] the seriousness of this type of criminal misconduct." *Id.* at 1261. We hold that the sentence is clearly mistaken.

Accordingly, the sentence is DISAPPROVED.

COATS, Judge, dissenting.

In our system of justice, sentencing is primarily a trial court function. *Nicholas v. State*, 477 P.2d 447, 448–49 (Alaska 1970). A trial court judge is in a much better position to evaluate the defendant and the evidence. An appeals court, relying on a printed transcript and written briefs, is in a poor position to evaluate the offender and the offense. Appellate review of sentencing must therefore give trial courts broad deference in these areas.

Judge Weeks, who has had extensive experience as a prosecuting attorney, heard the evidence in two trials in this case. On the

---

9. Indeed, the sentencing court's remarks make it clear that its paramount concern was to fashion a sentence that would provide a maximum amount of protection against future similar misconduct by Hernandez. We recognize that the court's decision to suspend the imposition of Hernandez' sentence on the second-degree assault charge was prompted by its desire to find a mechanism that would prevent Hernandez from taking custody of daycare children for a period longer than the five-year maximum term of probation specified under AS 12.55.090(c). Suspending the imposition of Hernandez' sentence on the second-degree assault charge enabled the court to order Hernandez to refrain from having custody of children other than her own for a period of ten years, the maximum term for a

class B felony. *See* AS 12.55.085(a) (allowing courts to suspend the imposition of sentence and place defendants on probation for a period "not exceeding the maximum term of sentence that may be imposed."); *Cochran v. State*, 586 P.2d 175, 177 (Alaska 1978).

We do not suggest that using a suspended imposition of sentence in this manner is itself inappropriate, even in a nonmitigated case. However, the sentencing court's choice of a suspended imposition of sentence as means of enhancing public safety in no way restricted it from imposing a term of imprisonment that would have been sufficiently lengthy to serve the purposes of general deterrence and community condemnation. *See* AS 12.55.086.

record, it is difficult to tell exactly how Mrs. Hernandez injured the children. If she intentionally caused the injuries to the children, then I would agree with the majority of the court that the sentence Judge Weeks imposed was too lenient. If, however, Mrs. Hernandez recklessly caused the children's injuries by attempting to supervise too many children, the sentence was appropriate. Many people came forward in support of Mrs. Hernandez at the sentencing hearing. Judge Weeks found that Mrs. Hernandez was a person of good will and nearly always provided good care for the children. As I read his findings, Judge Weeks found that Mrs. Hernandez did not act intentionally, but recklessly, while she was under great stress. Therefore, the sentence Judge Weeks imposed was not too lenient.

Because Mrs. Hernandez was a first-felony offender, Judge Weeks had a great deal of discretion in imposing sentence. *State v. Jackson*, 776 P.2d 320, 327 (Alaska App. 1989). The one-year sentence that Judge Weeks imposed is appropriate for a "typical offender committing a typical or moderately aggravated offense." *Id.* at 326. The majority criticizes this sentence because Judge Weeks provided that Mrs. Hernandez could serve eight months of the sentence by performing community service. However, under AS 12.55.055(d) the legislature has provided that

> The court may offer a defendant convicted of an offense the option of performing community work in lieu of a sentence of imprisonment. Substitution of community work shall be at a rate of eight hours for each day of imprisonment.

In this statute, the legislature appears to me to have given trial courts discretion to substitute community service for jail time.

In *Jackson*, we concluded that it was inappropriate in some cases to substitute community work for the entire period of imprisonment. *Id.* at 329. In that case, we concluded that Jackson's offense required the court to impose at least a ninety-day jail term to properly emphasize the seriousness of the offense and community condemnation of the offender's misconduct. *Id.* at 328. In other cases, we have concluded that, at a minimum,

the court was required to impose a ninety-day period of actual incarceration in order to affirm these sentencing goals. *State v. Hooper*, 750 P.2d 840, 842 (Alaska App.1988); *State v. Karnos*, 696 P.2d 685, 687 (Alaska App.1985); *State v. Doe*, 647 P.2d 1107, 1111 n. 12 (Alaska App.1982). By imposing four months of actual incarceration as well as community service, Judge Weeks has met the requirements of the previous cases in sentencing Mrs. Hernandez. I see no reason, therefore, to criticize his decision to allow Mrs. Hernandez to substitute some community-work service for some of her period of imprisonment given the fact that he imposed four months of actual incarceration to emphasize the seriousness of the offense and community condemnation of the offense and the offender. It has become obvious that the State of Alaska has limited resources to imprison people. Clearly the top priority is to protect the public from repeat violent offenders. It seems to me that trial courts should be encouraged to consider alternatives to incarceration for first offenders, particularly those like Mrs. Hernandez who seem unlikely to reoffend if placed under proper probation controls.

I similarly would not criticize Judge Weeks' use of a ten-year suspended imposition of sentence. By suspending imposition of sentence, Judge Weeks was able to place Mrs. Hernandez on probation for ten years, twice as long as he could have done under any other sentencing scheme. *See* AS 12.55.-090(c) and AS 12.55.085(a). This allowed Judge Weeks to control Mrs. Hernandez under extensive probation supervision for an extended period of time. In the event that Mrs. Hernandez' probation was revoked, Judge Weeks would have had the authority to impose a sentence of up to ten years of incarceration. By suspending imposition of sentence, Judge Weeks was better able to ensure that Mrs. Hernandez would have no opportunity to reoffend.

In addition to the other penalties he imposed, Judge Weeks ordered Mrs. Hernandez to pay restitution totalling approximately $13,000 to the parents of the victims of her offenses. Judge Weeks found that Mrs. Hernandez had sufficient assets and earning ca-

pacity to pay this restitution. This restitution award should penalize Mrs. Hernandez while providing some relief to the victims of her crimes.

Accordingly, I conclude that the sentence Judge Weeks imposed was not clearly mistaken.