STATE of Alaska, Appellant,

v.

Aaron Leo BRUEGGEMAN, Appellee.

No. A–7621.

Court of Appeals of Alaska.

May 4, 2001.

Douglas H. Kossler, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellant.

Douglas O. Moody, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

This is a sentence appeal brought by the State. Aaron L. Brueggeman received a suspended imposition of sentence for the class B felony of perjury. The sentencing judge did not require Brueggeman to serve any time in jail as a condition of this sentence, although he did order Brueggeman to perform 500 hours of community work. The State contends that this sentence improperly fails to reflect the seriousness of Brueggeman's

crime—that it fails to satisfy the sentencing goals of deterrence and reaffirmation of societal values. We agree with the State, and we therefore disapprove the sentence.[1]

### Facts of the case

In March 1996, a young woman gave birth to a daughter. Brueggeman was the father of this child. Initially, Brueggeman acknowledged the child as his, but he later developed doubts about his paternity and stopped supporting his child.

In May 1996, the mother of the child applied for public assistance. She identified Brueggeman as her child's father, and she assigned her child support rights to the State. In August 1996, the Child Support Enforcement Division (CSED) filed a paternity action against Brueggeman.

Brueggeman privately arranged for genetic testing at the Valley Phlebotomy Service in Wasilla. On October 28, 1996, he directed the mother and child to go there so that the service could obtain genetic samples from them. The next day, Brueggeman had his friend (and later co-defendant) David Hood go to Valley Phlebotomy and pose as Brueggeman. Hood identified himself as Brueggeman, presented the service with Brueggeman's Alaska State identification card, signed his name as Brueggeman, and provided a sample for paternity testing.

Not surprisingly, genetic testing of this sample excluded "Brueggeman" (i.e., Hood) as the father of Brueggeman's child. Brueggeman filed the test results with the court and asked the court to dismiss the paternity case. But the State was not satisfied that Brueggeman was in fact the person who provided the sample, so the State asked the court to order another paternity test. Brueggeman opposed the motion and claimed that he was being harassed because he had already taken a paternity test.

Over Brueggeman's objection, the superior court granted the State's motion for another test. Brueggeman missed two scheduled appointments for this second test, the second

on advice of counsel. Finally, the court granted the State's motion to compel Brueggeman to appear for testing.

While this litigation was proceeding, Brueggeman condoned and participated in a letter-writing campaign conducted by a woman who was a friend of his family. The aim of this campaign apparently was to convince various state legislators that the CSED was harassing an innocent citizen, so that these legislators would pressure the CSED and the Attorney General's Office to drop the paternity suit against Brueggeman. These letters contained language and assertions personally approved by Brueggeman. The letters accused the CSED of harassing Brueggeman by requesting a second paternity test. The letters also asserted that the child's mother was a promiscuous woman who had falsely accused Brueggeman of being the father of her child because she was poor and needed money.

Ultimately, Brueggeman (now represented by counsel) notified the court that he would submit to the additional paternity test under protest. However, Brueggeman once more conspired with Hood to defraud the court, the State, and the child's mother. On September 25, 1997, Hood appeared for the court-ordered test and once again identified himself as Brueggeman. He presented Brueggeman's identification and signed his name as Brueggeman. Hood then provided a sample for genetic testing. And again, the genetic testing of Hood's body sample showed that "Brueggeman" (i.e., Hood) was not the father of Brueggeman's daughter.

This time, however, the people who administered the test took Hood's photograph and thumb print. When the State showed this photograph to the mother of the child, she identified the person in the photograph as Hood, not Brueggeman.

Meanwhile, Brueggeman moved for summary judgment in the paternity case based on the result of the second genetic test. The State opposed Brueggeman's motion, offering

---

1. When the state appeals a sentence as too lenient but the defendant does not appeal the sentence as excessive, we are not authorized to increase the sentence. We may only "express [our] approval or disapproval of the sentence and [our] reasons" for doing so. AS 12.55.120(b). See also State v. Sykes, 891 P.2d 232, 233 (Alaska App.1995).

an affidavit from the mother in which she identified Hood as the person in the photograph taken at the court-ordered test.

Rather than admitting his fraud, Brueggeman answered with his own affidavit in which he falsely claimed that he had twice appeared and been tested, both at the original genetic test in October 1996 and at the second, court-ordered test in September 1997. To further bolster his position, Brueggeman induced Hood to sign a false supporting affidavit. In his supporting affidavit, Hood falsely claimed that he had never taken a paternity test and, more specifically, that he had never done so for Brueggeman.

In the face of these competing affidavits, the court ordered both Brueggeman and Hood to provide genetic samples and fingerprints. This third round of genetic testing confirmed that the genetic samples from the two prior tests could not have come from Brueggeman (and had probably come from Hood). The testing also showed that Brueggeman was the father of the child. Finally, the court-ordered fingerprinting showed that the thumb print taken at the time of the second test (September 1997) was Hood's.

Based on these facts, a grand jury indicted Brueggeman on one count of scheme to defraud,[2] two counts of tampering with physical evidence,[3] and four counts of perjury.[4] The State also filed an information charging Brueggeman with attempted criminal non-support.[5]

Brueggeman ultimately reached a plea agreement with the State in which he pleaded no contest to one count of perjury and to attempted criminal non-support. The plea agreement called for open sentencing on the perjury charge and for a sentence of 90 days' imprisonment, all suspended, on the attempted criminal non-support charge. The State dismissed the other charges.

### The sentencing

Perjury is a class B felony, punishable by a maximum term of 10 years' imprisonment and by a fine of up to $50,000.[6] Because Brueggeman was a first felony offender, he was not subject to a presumptive term.[7] However, his sentence was governed by the guidelines established by this court in *State v. Jackson.*[8]

In *Jackson,* this court reviewed sentencing decisions for first felony offenders convicted of class B felonies. Based on our review of past sentences, and relying on the rule we announced in *Austin v. State*[9] (that a first felony offender should normally receive a more favorable sentence than the applicable presumptive term for a second felony offender[10]), we declared in *Jackson* that a typical first felony offender committing a typical to moderately aggravated class B felony should receive between 1 year and 4 years to serve.[11] Sentences of between 90 days and 1 year to serve should be imposed only in a case "that is less serious than the norm for the offense, either because it involves mitigated conduct or [because it involves] an offender whose background indicates particularly favorable prospects for rehabilitation."[12] Finally, "probationary" sentences—sentences involving less than 90 days' incarceration—"should be reserved for cases that are significantly mitigated in terms of both the offender and the offense."[13]

Although the State was not seeking a sentence of more than 4 years to serve, the State proposed two aggravating factors under AS 12.55.155(c): (c)(10)—that Brueggeman's conduct was among the most serious

---

**2.** AS 11.46.600(a).

**3.** AS 11.56.610(a)(2), (3).

**4.** AS 11.56.200(a).

**5.** AS 11.51.120(a); AS 11.31.100(a).

**6.** *See* AS 12.55.035(b)(2); AS 12.55.125(d).

**7.** *See* AS 12.55.125(d).

**8.** 776 P.2d 320, 326–27 (Alaska App.1989).

**9.** 627 P.2d 657 (Alaska App.1981).

**10.** *See id.* at 657–58.

**11.** *See* 776 P.2d at 326.

**12.** *Id.*

**13.** *Id.* at 327.

included within the definition of the offense; and (c)(16)—that Brueggeman's conduct was designed to obtain substantial pecuniary gain with slight risk of prosecution and punishment. The defense proposed one mitigating factor under AS 12.55.155(d): (d)(9)—that Brueggeman's conduct was among the least serious included within the definition of the offense. In addition, the defense proposed the non-statutory mitigating factor of exceptional prospects for rehabilitation.[14]

The superior court received letters from more than thirty of Brueggeman's friends and relatives—including one from the mother of the child, who had reconciled with Brueggeman and was now engaged to marry him. All of these letters urged the court to show leniency because Brueggeman's crime was an uncharacteristic episode in an otherwise exemplary life, and because Brueggeman was now prepared to assume responsibility for his child.

Early in the sentencing proceedings, Superior Court Judge Larry D. Card announced that, "unless something drastically [different]" was revealed at sentencing, he was prepared to give Brueggeman a very lenient sentence:

> Mr. Brueggeman ... has no prior criminal record, he's a youthful offender, [and] even under [the sentencing guidelines established in *State v.*] *Jackson* he's the type of person that appears, unless proven otherwise, ... to have exceptional rehabilitation prospects, and it also appears [to me] that going to jail would not be ... in his interests or [the] interests of the family that we're trying to get supported. ... I deal daily [with cases of] murder, rape, and robbery, and among [those] cases, even [class] B felonies, this is not [one of] those which appear to be most serious, even among white-collar criminals.

Later, toward the close of sentencing, Judge Card reiterated that he believed Brueggeman had exceptional prospects for rehabilitation. The judge declined, however, to make express findings on the other mitigating factor proposed by the defense (conduct among the least serious within the defi-

nition of the offense), or on the aggravating factors proposed by the State. Instead, Judge Card declared that, "[f]or purposes of any appeal, [the Court of Appeals] can refer to my previous findings on this fact pattern" at the earlier sentencing of Brueggeman's co-defendant, David Hood.

Judge Card's remarks at Hood's sentencing show that he rejected the contention that Brueggeman's offense was among the least serious within the definition of perjury. At Hood's sentencing, Hood argued that the court should find mitigator AS 12.55.155(d)(13)—that the facts surrounding his offense demonstrated that he had caused only slight harm, harm so minor as to be "inconsistent with the imposition of a substantial period of imprisonment." Judge Card declared that Hood had failed to prove this mitigator:

> [T]his is not minor, it's a very important issue, as [the prosecutor] [h]as so aptly argued. The entire child support system is under assault. As a civil judge, I did ... hundreds ... of civil support cases. Difficult cases. And to frustrate the ends [of justice] by an act like this does not constitute the least serious [conduct]. I think it probably could go right to the heart [of the system] if we had many more people doing this.

As Judge Card found, Hood participated in this criminal episode only because Brueggeman prompted him to; the judge declared that he held Brueggeman "responsible for Mr. Hood being involved." Moreover, Hood was clearly the junior partner in the enterprise. According to testimony given at Hood's sentencing, Hood's IQ is subnormal and his level of verbal functioning is so low that the psychologist could not administer the Minnesota Multiphasic Personality Inventory II to him. Thus, when Judge Card declared that Hood's offense was not minor, and when he declared that he was re-adopting this finding for purposes of Brueggeman's sentencing, Judge Card necessarily rejected proposed mitigator (d)(9). That is, the judge necessarily rejected the contention that Brueggeman's conduct was among the least serious within the definition of perjury.

---

**14.** *See Smith v. State,* 711 P.2d 561, 571–72 (Alaska App.1985).

Despite Judge Card's finding that Brueggeman's offense was not among the least serious conduct within the definition of perjury—that, in fact, Brueggeman's offense "[went] right to the heart" of the justice system, Judge Card decided to impose a sentence that did not include any jail time. The judge declared that Brueggeman was a "young naive unsophisticated kid" who "did what kids do"—he "committed a very ... stupid act." Although Brueggeman had repeatedly lied under oath and presented false evidence, Judge Card concluded that Brueggeman was "not the type of person [who] would normally have done that. He [has] a good character. ... He's basically ... a good kid. He's remorseful."

Judge Card then addressed the *Jackson* sentencing guidelines:

> [When] I look at *Jackson* as a guideline[,][w]e have a Class B felony, we have a first-time felony offense, and this is the kind of case [that] I think rings out for a probationary sentence involving less than 90 days [of imprisonment]. [Such a sentence is] appropriate for a first-time offender, and that is what he is. He has no criminal record. And ... [t]his is a case which ... is significantly mitigated because even though there was a speculation that there could've been a huge amount of [unpaid child support], that was mere speculation. It's kind of like the embezzler who has a good scheme but gets caught [early on]. ... [T]his is not really the type of offense that he could've gotten away with very long.

Judge Card then gave Brueggeman a suspended imposition of sentence, placing him on probation for 5 years. The judge did not require Brueggeman to serve any jail time. He imposed a fine, but he suspended the fine in its entirety. Judge Card did, however, order Brueggeman to perform 500 hours of community work. He also ordered Brueggeman to pay $8,000 restitution to the State, which amounted to less than one-third of the State's costs in pursuing the paternity action and defending itself against Brueggeman's false accusations of harassment.

## *Analysis of Brueggeman's sentence under the guidelines established in* State v. Jackson.

█ Brueggeman's sentence—a suspended imposition of sentence with no jail time—is a "probationary" sentence for purposes of the *Jackson* guidelines. Accordingly, the superior court should not have imposed this sentence unless Brueggeman's case was "significantly mitigated in terms of both the offender and the offense." [15]

As explained above, Judge Card found that Brueggeman was an atypically mitigated offender—a "naive, unsophisticated kid" who engaged in "stupid" youthful misdeeds that were unlikely to be repeated. We have our doubts about this characterization of Brueggeman as an offender.

For more than a year, Brueggeman engaged in repeated acts of fraud and perjury in order to escape his financial obligation to his child. He may have been ignorant of how DNA testing was conducted, but there is no reason to doubt that he understood what consequences his actions would have on his child, the child's mother, and the state officials who were trying to see that justice was done.

Brueggeman did not give way to impulse on a single occasion. Rather, he committed a series of serious felonies over the course of a year. Finding himself in trouble, he repeatedly lied, he repeatedly presented false evidence (through his friend, Hood), and he suborned perjury. The testimonials of his friends and his family attest that this is uncharacteristic behavior for Brueggeman. But the record of Brueggeman's actions might cause a reasonable person to conclude that, given similar circumstances in the future, Brueggeman would be tempted to commit similar crimes.

Moreover, even accepting Judge Card's characterization of Brueggeman, Brueggeman should not have received a probationary sentence. Under the *Jackson* guidelines, in order to impose a probationary sentence, Judge Card was obliged to find not only that Brueggeman was a significantly mitigated

15. *Jackson,* 776 P.2d at 327.

offender but also that Brueggeman's offense was significantly mitigated. Although Judge Card concluded that Brueggeman was a significantly mitigated offender, he did not find that Brueggeman's offense was significantly mitigated. In fact, as explained above, Judge Card found the opposite. The judge rejected the contention that Brueggeman's offense was among the least serious within the definition of perjury. Instead, he declared that Brueggeman's offense placed "[t]he entire child support system ... under assault."

True, Judge Card later declared Brueggeman's case was "the kind of case [that] rings out for a probationary sentence ... involving less than 90 days [of imprisonment]." But the judge's remarks appear to be based on a misconstruction of the *Jackson* guidelines.

■ Judge Card declared that, under *Jackson*, a probationary sentence was "appropriate for a first-time offender [who] has no criminal record." This is incorrect. All of the *Jackson* benchmark ranges are premised on the fact that the offender before the court is a first felony offender. While the absence of a misdemeanor record may conceivably be a mitigating circumstance under *Jackson*, it is not sufficient to trigger a presumption that the offender should receive a probationary sentence.

Judge Card also declared, just before he pronounced sentence, that Brueggeman's case was "significantly mitigated." As explained, this statement is in conflict with the judge's earlier finding at Hood's sentencing—a finding that the judge incorporated by reference at Brueggeman's sentencing. But even if Judge Card had truly viewed Brueggeman's offense as "significantly mitigated," the record does not support this characterization.

Brueggeman induced Hood, a mentally impaired friend, to offer false evidence so that Brueggeman could avoid a determination of paternity. Over the course of the next year, Brueggeman repeatedly committed perjury to cover up this fraud. When his lies were questioned in court, Brueggeman induced Hood to commit perjury on his behalf, and he also induced Hood to offer false evidence a second time.

Moreover, Brueggeman was an accomplice in a letter-writing campaign addressed to numerous state legislators. Although Brueggeman did not compose or personally send these letters, he approved their content before they were sent. Brueggeman knew that these letters falsely accused state officials in the CSED and the Attorney General's Office of harassing him and abusing their authority. He also knew that the aim of this campaign was to exert enough political pressure on the CSED and the Attorney General's Office to make them stop their investigation. That is, Brueggeman understood that if the letter-writing campaign were successful, he might get away with his perjury and his fraud.

Judge Card apparently concluded that Brueggeman's actions were the product of immaturity and fear. But even so, this does not make Brueggeman's crimes "significantly mitigated." In *Huff v. State*,[16] a real estate broker committed perjury to avoid revealing that he had embezzled a client's funds.[17] The supreme court found that the defendant's perjury had been due to "weak character and fear ... rather than malice or greed," but the court nevertheless upheld a prison sentence of 3 years to serve.[18]

Brueggeman committed a string of felonies over the course of a year. He repeatedly perjured himself in order to defeat the paternity case against him. In *Machado v. State*,[19] we affirmed the superior court's conclusion that the defendant's perjury was among the most serious because the defendant's falsehoods related to a material issue in the case and the defendant lied in an attempt to defeat the case against him.[20] The same is true in Brueggeman's case.

16. 598 P.2d 928 (Alaska 1979).

17. *See id.* at 931.

18. *Id.* at 936.

19. 797 P.2d 677 (Alaska App.1990).

20. *See id.* at 690.

Moreover, Brueggeman induced Hood to offer false evidence on two occasions, and he also suborned perjury from Hood—conduct which, under *Boyles v. State*,[21] is another aggravating factor in a perjury prosecution.[22] Finally, Brueggeman tried to bring political pressure to bear against government officials so that they would stop seeking the truth.

In sum, Brueggeman's course of conduct is not a "significantly mitigated" instance of perjury. Any finding to the contrary would be clear error.

Thus, even assuming that Brueggeman was an offender with exceptional potential for rehabilitation, Brueggeman's probationary sentence is still improper under the *Jackson* guidelines. To support a probationary sentence—a sentence entailing less than 90 days to serve—both the offender *and* the offense must be significantly mitigated. As just explained, Brueggeman's offense was not significantly mitigated. Judge Card therefore should not have given Brueggeman a probationary sentence.

*We re-affirm the* Jackson *guidelines for probationary sentences, and we disapprove Brueggeman's sentence because it violates those guidelines*

In his brief to this court, and as reiterated at oral argument, Brueggeman recognizes that the record might not support a finding that his conduct was significantly mitigated. Brueggeman therefore asks us to uphold Judge Card's sentencing decision by repudiating the *Jackson* sentencing guidelines.

Brueggeman relies on the Alaska Supreme Court's decision in *State v. Wentz*.[23] In *Wentz*, the supreme court disapproved a sentencing guideline established by this court because the guideline imposed "an artificial ceiling" on a sentencing judge's discretion—a ceiling that "limit[ed] a large class of offenses to the lower end of the sentencing spectrum"

established by the legislature.[24] The supreme court declared that the range of reasonable sentences for a particular offense must be determined "by an examination of the particular facts of the individual case in light of the *total range of sentences authorized by the legislature for the particular offense*." [25]

Conceivably, the top range of the *Jackson* guidelines might be attacked as being inconsistent with *Wentz*. The legislature has established a sentencing range of 0 to 10 years for class B felonies but, under *Jackson*, first felony offenders convicted of a class B felony will almost always receive sentences of 6 years or less to serve.[26] (We note, however, that even after *Jackson*, we have approved sentences of up to 10 years to serve for a first felony offender convicted of a class B felony.[27])

But such a critique would not help Brueggeman, for he is not attacking the top benchmark range established in *Jackson*. Instead, Brueggeman is attacking the *Jackson* guideline concerning probationary sentences.

If, as Brueggeman contends, the *Jackson* guidelines must be thrown out because they artificially restrict a first felony offender's sentence to a narrower range than the 0 to 10 years established by the legislature, it would become harder, not easier, to justify a probationary sentence. Under Brueggeman's proposal, a sentencing judge who desired to impose no jail time on a first felony offender convicted of a class B felony would have to explain, not why the defendant's sentence should fall at the very bottom of a 0– to 6–year range, but rather why the defendant's sentence should fall at the very bottom of a 0– to 10–year range.

This would be a more difficult task. For, as the supreme court explained, the basic

---

**21.** 647 P.2d 1113 (Alaska App.1982).

**22.** *See id.* at 1119–20.

**23.** 805 P.2d 962 (Alaska 1991).

**24.** *Id.* at 965.

**25.** *Id.* (Emphasis in the original).

**26.** *See* 776 P.2d at 326 (setting a benchmark sentencing range of 4 to 6 years to serve for a first felony offender who commits an "exceptionally aggravated" class B felony).

**27.** *See, e.g., Davis v. State,* 793 P.2d 1064, 1066 (Alaska App.1990).

principle underlying *Wentz* is that sentencing discretion must be exercised with an eye toward the entire range of authorized sentences—with "the upper range of the [sentencing] spectrum ... reserved for more serious offenses and offenders, [and sentences] in the lower end [of the spectrum reserved] for less grave criminal offenders and criminal conduct." [28] If Brueggeman's sentence were to be assessed with an eye toward the entire sentencing range of 0 to 10 years established for class B felonies—that is, if the range of sentences were nearly twice as great—then it logically follows that the number of offenders deserving to serve no jail time at all would be correspondingly smaller.

But we need not speculate on this matter further because we are convinced that the *Jackson* guidelines do not violate *Wentz*. The *Jackson* benchmark sentencing range for a typical to moderately aggravated offense is based on the rule in *Austin*. [29] That is, for all but exceptionally aggravated cases, a first felony offender convicted of a class B felony should receive a more favorable sentence than the 4 year presumptive term established by the legislature for a second felony offender convicted of a class B felony. [30] The supreme court in *Wentz* specifically approved the *Austin* rule. [31] We therefore believe that the *Jackson* benchmark ranges are consonant with the supreme court's decision in *Wentz*.

In particular, we re-affirm the *Jackson* guideline for probationary sentences, the guideline which specifies that an offender convicted of a class B felony should receive at least 90 days to serve unless the case is exceptionally mitigated—"significantly mitigated in terms of both the offender *and the offense.*" [32] As we stated in *Jackson,* when the legislature has determined that a particular crime is serious enough to be classified as a B felony, then even though a defendant has excellent prospects for rehabilitation, if the defendant's conduct is typical of the conduct encompassed in the definition of the offense, a sentence of at least 90 days' imprisonment will still be necessary to demonstrate the seriousness of that conduct and to satisfy the sentencing goal of condemning the criminal act and reaffirming societal norms. [33]

We acknowledge, as we did in *State v. Hernandez,* [34] that sentencing decisions are undeniably complex and that they inevitably involve a large measure of subjective judgment. [35] But if we are to attain the twin goals of sentencing codified in AS 12.55.005—the attainment of reasonable uniformity and the elimination of unjustified disparity—then

> our legal system [must be] committed to the notion that sentencing is ultimately a rational process—that sentences ought to be based not on the sentiment of the moment or on some inarticulable predilection of the [sentencing judge], but on sound reasons based in law, reasons capable of being articulated.[36]

To this end, *Jackson* requires that when a defendant has committed a class B felony, the defendant should not receive a probationary sentence—the least severe sentence possible—unless both the offender *and* the offense are exceptionally mitigated.

Brueggeman's offense was not mitigated. Thus, even though he might have excellent prospects for rehabilitation, he should not have received a probationary sentence. Accordingly, we disapprove Brueggeman's sentence.

This is not to say that we disapprove Judge Card's decision to grant Brueggeman a suspended imposition of sentence. As we noted in *Hernandez:*

> Although ... a suspended imposition of sentence is usually associated with a par-

**28.**   805 P.2d at 966.

**29.**   *See Jackson,* 776 P.2d at 326 (citing *Austin,* 627 P.2d at 657–58).

**30.**   *See id.*

**31.**   *See Wentz,* 805 P.2d at 966–67.

**32.**   *Jackson,* 776 P.2d at 327 (emphasis added).

**33.**   *See* 776 P.2d at 336–37;  AS 12.55.005(6).

**34.**   877 P.2d 1309 (Alaska App.1994).

**35.**   *See id.* at 1316.

**36.**   *Id.*

ticularly mitigated offense, we do not suggest that suspended impositions of sentence should invariably be deemed to result in a more lenient sentence or that their use is categorically limited to mitigated cases.[37]

We disapproved the sentence in *Hernandez* not because the superior court granted the defendant a suspended imposition of sentence but because the superior court granted "a suspended imposition of sentence in combination with a relatively brief term of incarceration and [allowed the defendant to substitute] community service in lieu of two-thirds of the jail term that the court imposed." [38] Brueggeman's sentence is flawed for the same reason.

■ Although a sentencing judge is empowered to require a defendant to serve time in jail as a condition of a suspended imposition of sentence,[39] Judge Card did not require Brueggeman to serve any jail time. We acknowledge that Judge Card did require Brueggeman to perform 500 hours of community service (equivalent to 62½ days of work at 8 hours per day). But in *Jackson* we held that a similar sentence (*i.e.*, a sentence that did not require the defendant to serve any time in jail) was unlawfully lenient even though it required 1,000 hours of community work—twice the amount required of Brueggeman. We explained that

> the language of AS 12.55.055(d) makes it reasonably clear that the legislature did not regard community work as the functional equivalent of incarceration in all situations. ... [W]e conclude that community work cannot properly be relied on to replace jail time altogether when the circumstances surrounding an offender's conviction for a class B felony, and the consequent need to emphasize community condemnation, ... require the imposition of a nonprobationary term.[40]

In such cases, we declared, a sentencing court's decision to completely replace incarceration with community work "would unduly depreciate the seriousness of the offense and underemphasize the community's condemnation of the offender's misconduct." [41] Just as we disapproved 1,000 hours of community work (the equivalent of 125 days) as a complete substitute for incarceration in *Jackson*, we disapprove Brueggeman's 500 hours of community work as a complete substitute for the incarceration required for his offense under the *Jackson* guidelines.

We note that *Jackson* does not preclude substitution of community service for a portion of the required incarceration. We further note that, under AS 12.55.015(a)(3), a sentencing court is authorized to allow a defendant to serve a term of imprisonment in periodic installments, or seasonally, so as not to jeopardize the defendant's livelihood. Conceivably, Judge Card might have used these alternatives to fashion a sentence that would allow Brueggeman to remain with his family and maintain his employment, yet at the same time satisfy the sentencing goals of deterrence and community condemnation.

But Brueggeman's sentence, as actually imposed, fails to satisfy these sentencing goals. As explained in *Jackson*, when a person (even a first offender) commits a class B felony, the seriousness of the crime requires a non-probationary sentence in all but the most mitigated instances—instances in which *both* the offender *and* the offense are significantly mitigated. Brueggeman's offense is not mitigated, and for this reason he should not have received a probationary sentence. Accordingly, we DISAPPROVE the sentencing decision of the superior court.

COATS, Chief Judge, concurring.

The supreme court has cautioned this court to not apply sentencing guidelines too strictly.[1] In light of this, our guidelines in

---

37. *Id.* at 1314 n. 7.

38. *Id.*

39. *See* AS 12.55.086.

40. *Jackson,* 776 P.2d at 329.

41. *Id.*

1. *See State v. Hodari,* 996 P.2d 1230 (Alaska 2000); *State v. Wentz,* 805 P.2d 962 (Alaska 1991).

*Jackson*[2] for determining when a sentence is too lenient appear to me to be suspect. Most of our guidelines are based upon statutory interpretation[3] or a careful analysis of former sentencing decisions.[4] The lower limit guidelines in *Jackson* are not based on either—they are uniquely court-created guidelines. Therefore, I am reluctant to join with the majority's continued endorsement of these guidelines.

That having been said, we do have substantial case law that establishes, at least barring an exceptional case, that defendants should spend at least some time in jail for serious felony offenses.[5]

I respect Judge Card's decision to emphasize Brueggeman's rehabilitation in imposing sentence. But in light of Brueggeman's aggravated perjury offense, the court was required to impose some period of incarceration to reflect the seriousness of the offense. The only exception would be if the court found that this was one of those "truly exceptional cases [where] specific circumstances might warrant the conclusion that even a relatively brief period of incarceration would substantially jeopardize an offender's prospects for rehabilitation."[6] It does not appear that Judge Card did make or could have made this finding in this case. I accordingly concur in the decision concluding that the sentence imposed was too lenient.

**2.** 776 P.2d 320, 326–27 (Alaska App.1989).

**3.** *See Austin v. State,* 627 P.2d 657 (Alaska App. 1981).

**4.** *See Williams v. State,* 809 P.2d 931 (Alaska App.1991); *Page v. State,* 657 P.2d 850 (Alaska App.1983).

**5.** *See State v. Hernandez,* 877 P.2d 1309 (Alaska App.1994); *State v. Karnos,* 696 P.2d 685, 687 (Alaska App.1985).

**6.** *Jackson,* 776 at 327 n. 5.